**UNITED STATES TRUST COMPANY OF NEW YORK, The Bank of New York, and The Chase Manhattan Bank, N.A., as trustees of certain unit investment trusts, Plaintiffs,**

v.

**Steven L. ALPERT, et al., Defendants.**

**INVESTORS FIDUCIARY TRUST COMPANY, as trustee of the Kemper Tax–Exempt Income Trust, Plaintiff,**

v.

**Janet C. JENNER, et al., Defendants.**

Nos. 92 Civ. 9393(KMW), 93 Civ. 3935(KMW).

United States District Court, S.D. New York.

Aug. 21, 1995.

Jack Kaplan, Carter, Ledyard & Milburn, New York City, for U.S. Trust Co. of NY and Chase Manhattan Bank.

Ellen J. Bickal, Emmet Marvin & Martin, New York City, for Bank of NY.

Warren N. Stone, Kent T. Stauffer, New York City, for Chase Manhattan Bank (Nat. Ass'n).

John K. Weir, Haight Gardner Poor & Havens, New York City, for Robert Haserot.

John F. Triggs, Jacobson & Triggs, New York City, for Isaac T. Avery, Jr., Julia C. Daniel, Eunice M. Mauger, Donald J. Phillips, Ralph E. Phillips, Leonard Romanik, Carlton G. Thomas, Wilton J. Benolt, John B. Mantonya, Stanley A. Maple, Pauline D. Raymond, Earl W. Rogers.

Christopher Lovell, New York City, for Julia C. Daniel, Donald J. Phillips, Ralph E. Phillips, Wilton J. Benolt, John B. Mantonya, Stanley A. Maple, Pauline D. Raymond, Earl W. Rogers.

Stephen Pollak, Shea & Gardner, Washington, DC, for Herbert L. Weinreb, Dale D. Ackerman, Margaret P. Bell, Andrew G. Frantz, Ruby H. Hale, Roslyn P. Swire, Nita M. Trugman.

John Jacob Rieck, Jr., Doar Devorkin & Rieck, New York City, for Herbert L. Weinreb, Dale D. Ackerman, Margaret P. Bell, Andrew G. Frantz, Lawrence Kaplan.

William M. Dallas, Jr., Sullivan & Cromwell, New York City.

James E. Daniels, Hall, Dickler, Lawler, Kent & Friedman, New York City, for Bertha Daniels.

Edward F. Haber, Shapiro Grace Haber & Urmy, Boston, MA, for Leatrice Amsterdam.

Richard B. Dannenberg, Lowey Dannenberg Bemporad & Selinger, P.C., New York City.

Robert C. Schubert, San Francisco, CA.

Mark Rottenberg, David, Anderson & Rottenberg, New York City.

Paul H. Levinson, Leavy, Rosensweig & Hyman, New York City.

Martin E. Karlinsky, Camhy Karlinsky & Stein LLP, New York City.

Frederick V. Lochbihler, Chapman and Cutler, Chicago, Illinois.

William Edward Jenner, Jenner & Auxier, Madison, Indiana.

Edward N. Meyer, Winston & Strawn, New York City.

John A. Fiorenza, Fiorenza & Hayes, S.C., Milwaukee, Wisconsin.

Barry G. Felder, Brown, Raysman & Millstein, New York City.

## ORDER

KIMBA M. WOOD, District Judge.

In a Report and Recommendation (the "Report") dated July 25, 1995, Magistrate Judge Grubin recommended that class certification be granted in each of the above-captioned actions, and that counsel be appointed as indicated in the Report.

In conformity with *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir.1989), the Report explicitly cautioned that failure to file timely objections could constitute a waiver of those objections. No objections have been received. I therefore accept and adopt the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) (failure to file timely objections constitutes waiver of objections, and district court review not required).

It is hereby ordered that:

(1) Each action may be maintained as a class action.

(2) The following three defendant classes are certified in 92 Civ. 9393:

Class A. Current Holders: Persons who acquired units of one or more of plaintiffs' trusts after June 15, 1983 and held the same units on a date settlement distributions from *In re Washington Public Power Supply System Securities Litigation*, pending in the United States District Court for the District of Arizona under Docket No. MDL 551, were received by plaintiff trustee ("Record Date") or, if such trust had previously been terminated, on such trust's termination date ("Termination Date").

Class B. Former Holders: Persons who acquired units of one or more of plaintiffs' trusts on or before June 15, 1983 and disposed of the same units before any Record Date or the Termination Date.

Class C. Continuous Holders: Persons who acquired units of one or more of plaintiffs' trusts on or before June 15, 1983 and held the same units on a Record Date or the Termination Date.

(3) The following counsel are appointed lead counsel for the above classes in 92 Civ. 9393:

Class A: Haight Gardner Poor & Havens, 195 Broadway, New York, New York 10007

Class B: Jacobson & Triggs, 52 Duane Street, New York, New York 10007
Christopher C. Lovell, Esq., 52 Duane Street, New York, New York 10007

Class C: Shapiro Grace Haber & Urmy, 75 State Street, Boston, Massachusetts 02109

(4) The motions of Shea & Gardner and James E. Daniels, Esq. for appointment are denied.

(5) The following three defendant classes are certified in 93 Civ. 3935:

Class A. Current Holders: Persons who acquired units of plaintiff's trust after June 15, 1983 and held the same units on a Record Date.

Class B. Former Holders: Persons who acquired units of plaintiff's trust on or before June 15, 1983 and disposed of the same units before any Record Date.

Class C. Continuous Holders: Persons who acquired units of plaintiff's trust on or

before June 15, 1983 and held the same units on a Record Date.

(6) The following are appointed lead counsel for the above classes in 93 Civ. 3935:

Class A: Winston & Strawn, 175 Water Street, New York, New York 10038

Class B: Fiorenza & Hayes, S.C., 3900 West Brown Deer Road, Milwaukee, Wisconsin 53202

Brown Raysman & Millstein, 120 West 45th Street, New York, New York 10036

Class C: Shapiro Grace Haber & Urmy, 75 State Street, Boston, Massachusetts 02109

SO ORDERED.

## REPORT AND RECOMMENDATION

GRUBIN, United States Magistrate Judge:

These are two interpleader actions involving various unit investment trusts organized under the Investment Company Act of 1940 (the "Trusts"). Plaintiffs in each of these two actions are banks appointed as trustees by the investment banking firms which created the trusts. Defendants are individuals who purchased units and are named as class representatives of three separate classes in each action. Currently pending for the court's decision in each action is a motion by the plaintiffs for certification of the defendant classes pursuant to Fed.R.Civ.P. 23(b)(1) and motions by various counsel who have appeared on behalf of defendants to be appointed class counsel. For the reasons discussed below, I recommend that class certification be granted and counsel be appointed as indicated herein.

### FACTUAL BACKGROUND

The trusts were created between March 1, 1977 and January 21, 1982 and funded in part with State of Washington Public Power Supply System ("WPPSS") Generating Facilities Revenue Bonds that the trusts purchased during that period. On January 22, 1982

WPPSS announced that construction of the nuclear electrical facilities that the bonds were financing would be terminated because of construction cost overruns and less demand for electricity than anticipated. Ensuing litigation in the Washington state courts ended on June 15, 1983 with a decision of the Supreme Court of Washington that the purported state guarantees of the bonds were ultra vires and, hence, unenforceable. The bonds went into default the following month.

Needless to say, the market price of the bonds declined and numerous bondholder class actions were filed against WPPSS and related entities (lawyers, accountants, engineers, investment bankers, etc.) pursuant primarily to Rule 10b–5 and other federal securities laws. They were consolidated under the Multi–District Litigation rules and assigned to the Honorable William D. Browning in the United States District Court for the District of Arizona. Judge Browning certified a plaintiff's class of persons who had purchased bonds between the date of their initial offering, March 1, 1977, through the date of the decision of the Supreme Court of Washington, June 15, 1983. The trusts herein, as purchasers of the bonds, were class members. Eventually settlement was reached with all defendants and a plan for allocation of the settlement fund approved by Judge Browning. Appeals were taken, Judge Browning's decision was upheld, and, after the United States Supreme Court denied certiorari from the final appeal, Judge Browning authorized a distribution of most, although not all, of the settlement proceeds to the class plaintiffs.[1]

The plaintiff trustees here received the trusts' shares of the distribution on November 15, 1992. After filing their initial complaints herein, they deposited the money with the Clerk of Court pending the outcome of these actions. On March 25, 1994 plaintiffs received their shares of a second smaller partial distribution which has also been deposited with the court. These monies are invested in short term United States Trea-

1. At that time there were $892 million in the settlement fund, but after reserves and deductions for taxes, legal fees and other items, the distribution came to $504 million. As the total allowable loss shown in the proofs of claims was $1.422 billion, class members thus received about 35% of their allowable loss.

sury obligations. It is anticipated that further smaller distributions will be authorized by Judge Browning until the settlement fund is finally depleted. (These distributions will be hereinafter referred to as a whole as "settlement proceeds" or "the Fund" and the dates of their receipt by plaintiffs as "Record Dates").

Plaintiffs have brought these interpleader actions to have the court determine to whom they as trustees should pay these class action settlement proceeds. The essential issue sought to be resolved by these actions is whether plaintiffs are obligated to pay the settlement proceeds to (a) all unitholders (shareholders) of the trusts as of the Record Dates, *i.e.*, the dates the trustees received the Fund, (b) unitholders who held shares during the time the trusts purchased the WPPSS bonds, *i.e.*, prior to June 15, 1983, but who sold them prior to distribution of the settlement proceeds, or (c) all who were unitholders both at the time the trusts purchased the bonds *and* when the trusts received the Fund. The issue arises because the applicable trust indentures appear to require the distribution of all monies received by the trusts to unitholders who hold shares at the time monies are received, which, in this instance, would include persons who were not necessarily unitholders when the trusts were damaged by the alleged fraud for which the WPPSS settlement payments were made. Under this construction, a person who bought shares of the trusts since 1983, even after the alleged fraud was revealed and the price of the shares accordingly already adjusted in the market, would receive class action settlement proceeds. It is arguable that equity may require the payment only to unitholders or former unitholders who were damaged by the· alleged fraud, despite the language of the indentures. The trustee plaintiffs, unable to determine safely to whom the Fund should be distributed and subject to litigation for breach of trust no matter what they decided, ask this court to determine the issue.

### PARTIES AND PROCEDURAL HISTORY

The initial complaint herein in 92 Civ. 9393 was filed on December 29, 1992. The three plaintiffs are United States Trust Company of New York, The Bank of New York and The Chase Manhattan Bank, N.A., as trustees for the various unit investment trusts (hereinafter referred to as the *"U.S. Trust"* action).[2] The second action, 93 Civ. 3935, was subsequently filed on June 10, 1993 and accepted by and assigned to you as a related case. Plaintiff therein is Investors Fiduciary Trust Company, as trustee of the Kemper Tax–Exempt Income Trust (hereinafter referred to as the *"Investors"* action).[3]

The original complaint in the *U.S. Trust* action named as defendants only two classes of shareholders: "Current Holders," defined as persons who held shares (units) on the date the plaintiff trustees received distribution of the settlement proceeds authorized by the Multi–District court; and "Former Holders," defined as persons who had bought shares prior to June 15, 1983 but had sold them before distribution of the settlement proceeds. Plaintiffs named class representatives in each of these defendant classes, whom they had selected as follows. From computer lists of shareholders from the various trusts, they separated "current" holders from "former" holders, and selected persons with large holdings from each of the two groups randomly. They took only New York residents for the Current Holder class and residents of states other than New York for the Former Holder class so as to obtain

---

**2.** U.S. Trust acts herein as trustee of the following: Nuveen Tax–Exempt Unit Trust, National Municipal Trust, E.F. Hutton Tax–Exempt Trust, Dean Witter Tax–Exempt Trust, Tax–Exempt Municipal Trust, American Tax–Exempt Bond Trust, Tax–Exempt Securities Trust, Weeden Tax Exempt Bond Trust, Municipal Bond Trust, and Cardinal Tax–Exempt Bond Trust; Bank of New York acts as trustee for the Brown Exempt Securities Trust, Municipal Securities Trust, Southeast Tax–Exempt Income Trust, Investors' Quality Tax Exempt Trust, and Municipal Investment Trust Fund; and Chase Manhattan is trustee of the Municipal Investment Trust Fund.

**3.** While they are not consolidated cases, all issues are substantially similar, my conferences have been held jointly and briefing schedules have been coordinated. This Report and Recommendation, dealing with both cases, will be filed in each.

diversity jurisdiction. When they had approximately 50 names for each class, service of a summons and the complaint was made on each person named.[4]

While the distinction between the two classes separated those who held shares on the Record Date and, thus, would appear entitled to payment under the plain language of the trust indentures, from those who did not, I was concerned about conflicts of interest and inadequate representation based on the way the classes were defined. My main concerns resulted from the fact that the Current Holder class and, presumably, its named representatives, would include persons who had bought shares prior to the time the alleged fraud was revealed or the guarantees of the bonds were held unenforceable (June 15, 1983) as well as persons who bought thereafter when the fraud was known and the price had declined, since the only defining characteristic of this class was that they be persons who still held on the Record Date. This meant, for example, that a class representative who bought shares in 1990 would be representing persons who also bought shares back in 1980, so long as they both still held them on the date the trust received the settlement proceeds. Insofar as the 1990 purchaser was not damaged by the alleged fraud, she would be very differently situated from the 1980 purchaser, and since the court might well determine that those who had bought before June 15, 1983 were the ones entitled to the Fund or entitled to a greater share of it, I reasoned that neither the representatives nor their class counsel could adequately represent both categories of persons at the same time. If one were defrauded and still holds the shares, she would not want to share the Fund with someone who was not defrauded and still holds any more (and perhaps, on principle, less) than with someone who was defrauded and sold prior to the Record Date.[5]

While there were various other scenarios which created possible problems to my mind, we need not discuss them here. At a plenary conference in March 1993 I raised these issues with the parties. Part of the problem, I suggested to them, was that in these cases, unlike the usual class action, there is no one to protect fully all the class members out there who have not been notified except the court. This is so because the parties adversary to the classes, the plaintiff banks, do not oppose payment of the monies. Indeed, they are anxious to rid themselves of them and the dilemma and no doubt the administrative burden retaining them presents.[6] The lawyers for the defendants had no interest in challenging the methods either by which the plaintiffs chose to bring these actions nor by which they defined the classes, nor the adequacy of the class representatives chosen. Thus, at the very first conference with the parties, *everyone* present wished to move forward by having the classes certified, class counsel appointed and the plaintiffs dismissed from the suits—all essentially that day—without any discovery or briefing. No one to that time but this court questioned the methods and procedure by which plaintiffs chose to proceed, and I found very careful scrutiny was therefore necessary. Accordingly, at the plenary conference in March 1993 I raised my concerns as summarized above with the parties.

---

4. As might be expected, certain individuals receiving the pleadings naming them as defendants in a lawsuit were concerned and wrote to plaintiffs and/or the court asking not to be involved. Such individuals have been removed as named representatives. I issued an order, which was sent to all those named, providing that the time to answer or move would be stayed pending completion of service on all and a conference with the court. Some persons obtained counsel who filed answers and/or purported motions to intervene and/or to be appointed class counsel. Other persons, on whom service was not possible, have now been replaced by additional named representatives.

5. The Fund is limited, and the greater number of persons receiving payments, the less will be received by each individual. Furthermore, adding into the mix is the fact that the per-unit value is almost certainly going to be greater for a "current" holder than for a "former" since the number of units per trust have decreased over time.

6. Indeed, plaintiffs were hopeful that after depositing the settlement proceeds into court, they would be dismissed from the actions. They now acknowledge that they retain duties herein at least until the classes have been certified and class counsel approved.

In response to these concerns plaintiffs proposed an amended complaint that would contain three classes. The definition of Class A, Current Holders, would change so that it included only persons who bought units after June 15, 1983; Class B, Former Holders, would remain those who bought prior to June 15, 1983 but sold before the Record Date; and a new Class C would be of those who bought units prior to June 15, 1983 and also held units on the Record Date, although "not necessarily the same units." Letter to the Court, April 12, 1993, at 17. While this structure alleviated the problems inherent in the original definitions, I informed counsel it created another conflict in that it made some Class C members also members of Class A and Class B. I informed counsel:

> I find that the proposed definition of Class C ... may present a problem insofar as it would include plaintiffs who purchased units during the Class Period and sold them after default but thereafter purchased additional units still held in November 1992. It would seem that such a person *should* be a member of Class A with respect to the latter units and a member of Class B with respect to the former, but not a member of Class C. In other words, while the classes should be "mutually exclusive" as to units transacted, it does not appear appropriate to make them mutually exclusive as to individual plaintiffs. Prior to submission of the proposed amended complaint, therefore, I wish to discuss this matter with counsel.

Letter to All Counsel, May 17, 1993, at 1. After a conference, plaintiffs redrafted the definition, and the Second Amended Com-

plaint was filed in the *U.S. Trust* action which satisfies me that the actions are now in proper postures and the pending motions should be granted as recommended below.[7]

In both actions the classes that have now been pleaded and for which the plaintiff Trustees have moved for certification are as follows:

Class A. *"Current Holders":*

> [P]ersons who acquired units of one or more of the Trusts after June 15, 1983 and held the same units on the Record Date ... or, if such Trust had previously been terminated, on such Trust's termination date ("Termination Date").

Class B. *"Former Holders":*

> [P]ersons who acquired units of one or more of the Trusts on or before June 15, 1983 and disposed of the same units before the Record Date or the Termination Date.

Class C. *"Continuous Holders":*

> [P]ersons who acquired units of one or more of the Trusts on or before June 15, 1983 and who held the same units on the Record Date or the Termination Date.

*See U.S. Trust* Second Amended Complaint (hereinafter "Complaint") ¶¶ 6, 8, 10; *Investors* Second Amended Complaint (hereinafter "Complaint") ¶¶ 5–7. There is no dispute among the parties as to the proposed class definitions, nor has any opposition been filed to the maintenance of the cases as class actions or the interpleader posture of the cases.[8]

---

7. The *Investors* suit had not yet been filed at the time of the described proceedings. It was thereafter brought in the same form as the *U.S. Trust* Second Amended Complaint.

8. I see no problem with respect to the interpleader mode of proceeding and do not plan to discuss that aspect of the cases herein. In fact, U.S. Trust has used this vehicle before in this court. *See United States Trust Co. v. Executive Life Ins. Co.*, 602 F.Supp. 930 (S.D.N.Y.1984), *aff'd in pertinent part*, 791 F.2d 10 (2d Cir.1986). Subject matter jurisdiction exists because complete diversity is not required in an interpleader action under 28 U.S.C. § 1335, which provides that only "two or more" of the "adverse claimants" must be diverse. *See State Farm Fire & Casualty*

*Co. v. Tashire,* 386 U.S. 523, 530–31, 87 S.Ct. 1199, 1203–1204, 18 L.Ed.2d 270 (1967). For purposes of class actions, this diversity requirement rests in the citizenship of the representative parties, and there is no prohibition against selection of representative parties to satisfy diversity. *See Supreme Tribe of Ben Hur v. Cauble,* 255 U.S. 356, 365–66, 41 S.Ct. 338, 341–42, 65 L.Ed. 673 (1926); *see also Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 375 n. 17, 98 S.Ct. 2396, 2403 n. 17, 57 L.Ed.2d 274 (1978); *U.S.I. Properties Corp. v. M.D. Constr. Co.,* 860 F.2d 1, 6 (1st Cir.1988), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989). The requirement is satisfied in both cases.

## CLASS CERTIFICATION MOTIONS

In order to be maintained as a class action, a case must meet the four requirements of Fed.R.Civ.P. 23(a) and fall under one of the three subsections of Fed.R.Civ.P. 23(b). The parties herein agree that the classes designated should be certified under Rule 23(b)(1). I also agree and find that the requirements of Rule 23(a) and Rule 23(b) are met.

### A. *Fed.R.Civ.P. 23(a)*

■ 1. *Numerosity (Fed.R.Civ.P. 23(a)(1)).* The first requirement of Rule 23(a) is that "the class is so numerous that joinder of all members is impracticable." The *U.S. Trust* complaint alleges that each of the three classes includes at least 50,000 claimants, and the *Investors* complaint alleges that each of the three classes in that case includes "thousands" of members. *U.S. Trust* Complaint ¶ 27; *Investors* Complaint ¶ 20. The proposed defendant classes clearly meet the numerosity requirement of Rule 23(a)(1), and joinder "would be expensive, time-consuming, and logistically unfeasible." *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 290 (2d Cir.1992), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993) (where one class had 600 claimants and the other 160).

■ 2. *Commonality (Fed.R.Civ.P. 23(a)(2)).* The second requirement of the Rule, that "there are questions of law or fact common to the class," is also clearly met. Such questions predominate because the central questions in these cases will almost certainly be: (1) whether the plain meaning of the trust indentures will dictate that the Fund should be distributed to the Current Holder class (those who held units when the Fund was received by the Trusts but who were not "damaged" by the alleged WPPSS fraud) or whether equitable or other considerations will dictate the distribution of the Fund to the Former Holder class (those who were arguably damaged by the alleged fraud, but who were not unitholders when the Fund was received by the Trusts); and (2) whether the Continuous Holder class (those who were both arguably damaged by the alleged fraud and who still held units when the Fund was received by the Trusts) have rights superior to or co-existing with the other two classes. Resolution of these issues will require legal interpretation and analysis of the requirements of the indentures and inquiries into share prices and market movement at the various watershed dates for each of the classes. As these questions are common to all class members a class action is the most expeditious and suitable method for resolving them.

■ 3. *Typicality (Fed.R.Civ.P. 23(a)(3)).* That "the claims or defenses of the representative parties are typical of the claims or defenses of the class[es]" they would represent also is true. Because of the careful methods used in selecting the representatives for each class, no class representative is a member of any class other than the one she or he represents, and in these cases it is obvious that within each of the three respective classes "each class member's claim arises from the same course of events, and each class member [will] make[ ] similar legal arguments" as well as seek to achieve the maximum recovery for her or his particular class. *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d at 291.

■ 4. *Adequacy of Representatives (Fed.R.Civ.P. 23(a)(4)).* The Court of Appeals has explained that adequacy of representation is to be measured by two standards: (1) class counsel must be "qualified, experienced and generally able to conduct the proposed litigation," *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("*Eisen II* "); *see also Cullen v. New York State Civil Service Commission,* 566 F.2d 846, 848–49 (2d Cir.1977); *Klein v. A.G. Becker Paribas, Inc.,* 109 F.R.D. 646, 651 (S.D.N.Y.1986) ("vigorous prosecution of the action by the representative party ... entails that the party's attorney be qualified, experienced, and generally capable of conducting the litigation") (citing *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 101 (S.D.N.Y. 1981); *Herbst v. Able,* 47 F.R.D. 11, 15 (S.D.N.Y.1969)); and (2) the representatives and all class members must not have interests antagonistic to one another. *Id. See*

*also In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d at 291. As will be discussed later, I find proposed class counsel to be experienced, competent and qualified to pursue these cases and recommend their appointment, and the first requirement is, thus, satisfied.

As discussed above, the proposed class representatives would be adequate because they are all members of the classes they purport to represent and no class representative representing one class is also a member of another class. *See U.S. Trust* Complaint ¶¶ 6, 8, 10; Affidavit of Frederick V. Lochbihler, Esq. in support of motion ¶ 5. Thus, the class representatives would not have conflicts of interests with the class members they would represent. As no one has come forward with any reason to believe that any representative would have an interest antagonistic to the class members and as none is apparent, the second requirement of Rule 23(a)(4) is met.[9]

### B. *Fed.R.Civ.P. 23(b)(1)*

■ This subdivision of Rule 23, setting forth the remaining prerequisites for class actions, allows them to be maintained in three types of situations. As all parties agree that the first, contained in subsection (1), applies herein and seek certification thereunder, we need not concern ourselves with the other two. Rule 23(b) provides:

(b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. . . .

The requirements of *both* (A) and (B) are met herein. With respect to (A), if separate actions were to proceed before separate fora, some judges might interpret the trust indenture to require that only those holding units on the Record Date(s) are entitled to the distributions, while others might rule that only those who bought units during the class period (March 1, 1977 through June 15, 1983) were to receive them, and still other cases could yield results in varying combinations of the two. Furthermore, a Current Holder of a unit and a Former Holder *of that same unit* could prosecute separate individual actions and receive different results with respect to that unit. Who would the Trustee be obligated to pay? There are many examples of other problems that could be encountered by separate actions, but we need not elaborate further as it is obvious that the plaintiff Trustees would be at risk of being subjected to inconsistent or varying adjudications establishing incompatible standards of conduct for them and placing them in an untenable situation if successive legal proceedings issued contradictory directions regarding the disposition of the Funds. Indeed, it is to be expected that in such circumstances even further legal proceedings would no doubt be necessary to resolve the inconsistent situations and the cost to all concerned as well as the delay in unitholders' receiving the distributions would be far increased.

■ Clause (B) of Rule 23(b)(1) focuses on the harm that an individual adjudication

---

9. Unlike the typical plaintiff class action, as mentioned above, no "adversary" has challenged the adequacy of any representative in an effort to derail the lawsuit since all parties want it to proceed as framed. We can thus base our determination only on what we have been told by the plaintiffs as to class representatives. However, given the circumstances of class membership (based simply on dates of purchase and sale) and given the sheer number of class representatives—each *U.S. Trust* class has approximately 30 to 50 persons named—there is little reason to think any is "inadequate," nor would inadequacy of even a number of them in any given class make a difference to the resolution of the case. (While the *Investors* classes are to have only one representative each, in light of its much smaller scope involving only one trust, no problem is posed.)

might cause as a practical matter to a non-party to that particular suit who has an interest therein. The Advisory Committee Notes on the 1966 Amendment of Rule 23 state:

> In various situations an adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. *This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims.* A class action by or against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund, meets the problem.

(Emphasis added.) The Fund herein is, of course, a finite one that would be depleted with each payout and would not be sufficient to pay all claimants. Its distribution should not depend on who rushes to the courthouses first or chooses those courthouses that can render swifter results than others. *See In re Joint Eastern and Southern District Asbestos Litigation,* 982 F.2d 721, 735 (1992), *modified on other grounds on reh'g,* 993 F.2d 7 (2d Cir.1993) (defining "classic instance of a 'limited fund'" as where "a group of claimants asserted claims of an aggregate amount that would deplete a fixed sum of money" and explaining "a (b)(1)(B) class action is appropriate to avoid an unfair preference for the early claimants at the expense of later claimants"); *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d at 292.

Accordingly, I recommend that the classes be certified under both clause (A) and clause (B) of Fed.R.Civ.P. 23(b)(1) (although certification under either alone would be sufficient and have no different effect on the progress of the actions). *See United States Trust Co. v. Executive Life Ins. Co.,* 602 F.Supp. at 933 n. 3.

### C. *Notice and Opportunity to Opt Out*

The only dispute that has been raised by any of the parties is on the issue of whether notice and an opportunity to opt out of the classes should be given at this time. The plaintiffs' motions seek to have the classes certified and the actions proceed without notice being sent to absent class members at this time. The issue in dispute has been raised solely by one of the proposed representatives in the Continuous Holder class in the *U.S. Trust* case (Estate of Leatrice Amsterdam) and by one in the Continuous Holder class in the *Investors* case (Howard R. Stevens), both of whom are represented by the same counsel.[10] All proposed representatives in the Current Holder classes in each action, the Former Holder classes in each action and all others but these two in the Continuous Holder classes in each action have filed papers either affirmatively asserting that notice and an opportunity to opt out is not required and not desirable at this time or filed no papers opposing the plaintiffs' motions. I agree that an opportunity to opt out is not appropriate in these cases nor is notice to class members appropriate at this time.

Rule 23 does not require either prior notice or an opportunity to opt out in classes certified pursuant to Fed.R.Civ.P. 23(b)(1).[11] It appears that all parties, including Estate of Leatrice Amsterdam and Howard R. Stevens (both of whom will be referred to as "Estate" hereinafter for ease of reference), agree. Yet Estate contends that such should be ordered nevertheless because "there is considerable authority that class notice and opt-out rights are required as a matter of due process" and, "even if ... not constitutionally required, this court has ample discretion to order notice and/or the right to opt out, even for classes certified under Rule 23(b)(1)." Estate Memorandum at 2. Estate contends that the court should exercise such discretion so that we will have the benefit of input from absent class members who may have a perspective different from any

---

10. Stevens' brief is simply three sentences in its entirety, stating that he relies on the brief filed by Estate of Leatrice Amsterdam in the *U.S. Trust* case.

11. Were these cases to be dismissed or settled, notice and an opportunity for class members to object would then be required pursuant to Fed.R.Civ.P. 23(e).

that have occurred to the current parties or the court.

With respect to due process, Estate, while recognizing that "there is authority for the Trustees' position," relies on a statement in the decision of the Second Circuit in *Eisen II,* and the decision of the Supreme Court in *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). However, the *Eisen II* statement, which even Estate concedes was dicta, has since been discredited by the Second Circuit itself as well as the Supreme Court, other Circuit courts and the lower courts of this Circuit; and the *Shutts* case, the facts of which even Estate recognizes were "not precisely analogous to those at bar," I find thoroughly inapposite to our situation.

In *Eisen II,* the Court of Appeals reversed the district court's denial of a class certification motion. In holding that the action should have been certified under Rule 23(b)(3) (known as the section providing for "non-mandatory" class actions), the court noted that the plaintiff therein had attempted to obtain certification under Rule 23(b)(1) and 23(b)(2) (the so-called "mandatory" class action sections), although inappropriate for that case, because plaintiff believed notice to the class would then not be required.[12] In the course of its discussion the court stated that, although not required by the Rule, "Nevertheless, we hold that notice is required as a matter of due process in all representative actions, and 23(c)(2) merely requires a particularized form of notice in 23(b)(3) actions." 391 F.2d at 564–65. However, the Supreme Court, in rendering its decision in that case, explicitly noted that it was refraining from expressing any opinion regarding notice in mandatory class actions, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177 n. 14, 94 S.Ct. 2140, 2152 n. 14, 40

L.Ed.2d 732 (1974), and, in its subsequent decision in *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), a 23(b)(2) action, the Court expressly pointed out that the notice "problems" associated with Rule 23(b)(3) class actions were not present therein. 419 U.S. at 556 n. 4, 95 S.Ct. at 717 n. 4. *All* Second Circuit decisions since these Supreme Court decisions twenty years ago have rejected the 1968 *Eisen II* dicta and held that mandatory class actions may proceed without notice to class members without offending notions of due process. Thus, in *Marcera v. Chinlund,* 595 F.2d 1231 (2d Cir. 1979), *vacated on other grounds,* 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979), the court stated:

> It may be argued that we should not grant relief without first affording notice.... We conclude, however, that prior notice is required by neither Rule 23 nor the due process clause. Rule 23 does not require notice to (b)(2) plaintiff classes ... and the text of the rule does not differentiate between plaintiff and defendant classes on the issue of notice. Moreover, due process permits binding absentees to a judgment with respect to common questions of law if they have been adequately represented in the suit. In the class action context, notice is simply a means for assuring such adequacy, not an end in itself.

595 F.2d at 1240 n. 13. *Accord: Plummer v. Chemical Bank,* 668 F.2d 654, 658 (2d Cir. 1982); *Frost v. Weinberger,* 515 F.2d 57, 65 (2d Cir.1975), *cert. denied,* 424 U.S. 958, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976). *See also, e.g., Avagliano v. Sumitomo Shoji America, Inc.,* 614 F.Supp. 1397, 1399–1400 (S.D.N.Y. 1985); *United States Trust Co. v. Executive Life Ins. Co.,* 602 F.Supp. at 933 n. 3; *Tedeschi v. Blackwood,* 410 F.Supp. 34, 38 (D.Conn.1976); *Aitchison v. Berger,* 404 F.Supp. 1137, 1143 (S.D.N.Y.1975).[13]

**12.** Rule 23(c)(2) requires that notice of a class action and the right to opt out be sent to potential class members in an action certified under Rule 23(b)(3), but contains no such requirement with respect to 23(b)(1) and 23(b)(2) actions.

**13.** While most of these cases concerned Rule 23(b)(2) actions, rather than the 23(b)(1) type in *United States Trust Co. v. Executive Life Ins. Co.* and herein, there is no basis for distinguishing between the two mandatory class action types

with respect to notice since, as explained well by the Court of Appeals for the District of Columbia Circuit in *Larionoff v. United States,* 533 F.2d 1167, 1186 (D.C.Cir.1976), *aff'd,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977), which was a Rule 23(b)(1) action, "the factors that have prompted courts and commentators to conclude that due process does not require notice in Rule 23(b)(2) class actions are equally applicable to actions certified under Rule 23(b)(1)."

Estate's reliance on *Phillips Petroleum Co. v. Shutts* is also misplaced. In *Shutts*, investors in gas company leases on land from which natural gas was produced in 11 states brought a class action against the gas company under Kansas state law's analog to Rule 23 in Kansas state court claiming they were owed interest on royalty payments. The 28,000 investors were located in all 50 states, with about 97% of them having no connection to Kansas except for the lawsuit, and over 99% of the leases owned were on land not in Kansas. The Kansas courts applied Kansas substantive law to all claims and found the gas company liable to each class member for the royalty interest. The gas company contended that Kansas did not have jurisdiction over most of the class members because they lacked sufficient minimum contacts with Kansas and since they, therefore, would not be bound by the Kansas judgment, the company, although itself bound by the judgment, would also be subject to individual suits by class members elsewhere. The United States Supreme Court held that a forum state may exercise jurisdiction over the claim of an absent class action plaintiff who may not possess minimum contacts with that forum if the class action plaintiff receives notice and an opportunity to be heard and an opportunity to opt out of the class. Contrary to Estate's contention, this holding is hardly applicable to the instant situation where this court does have jurisdiction over the classes because the interpleader statute, 28 U.S.C. § 2361, provides it, *see also, e.g., Ginsburg v. Faragalli*, 776 F.Supp. 806, 808 (S.D.N.Y. 1991), (and, furthermore, in the *U.S. Trust* case, all the trusts were created in New York and are governed by New York law). Indeed, I do not understand Estate to be arguing that this forum lacks jurisdiction, but simply that notice and an opt-out opportunity is nevertheless required by due process. Such is simply not the case, and the Second Circuit has twice recently explicitly so stated. *In re Joint Eastern and Southern District Asbestos Litigation*, 982 F.2d at 735 (due process standards of *Shutts* not applicable where courts "fully entitled to exercise jurisdiction over the beneficiaries of a trust created in New York"); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d at 292 ("*Shutts* mandates that a plaintiff be permitted to opt out of a proposed class when the court does not have personal jurisdiction over the plaintiff.... Because there is no question that the court has jurisdiction over appellants, *Shutts* is inapposite.").[13]

We should also reject Estate's contention that, even though notice and an opportunity to opt out is not required at this time by due process, we should order it as a discretionary matter. Estate's only proffered reason for such a position is that, "although plaintiffs and defendants [including Estate] are in agreement on the need for class certification and the class definitions, it is impossible to know with certainty whether absent class members would likewise agree. It is possible that class notice will result in participation by intervenors who may have a different perspective on this action." Estate Memorandum at 8–9. But, such would *always* be "possible," thus requiring such notice in every class action brought. There is no particular reason to think that the multitude of parties and attorneys involved herein

Unlike the situation with respect to members of a Rule 23(b)(3) class, the members of a Rule 23(b)(1) class are likely to be more unified in the sense that there will probably be little interest on the part of individual members in controlling and directing their own separate litigation on the question at issue in the class suit. Indeed, in a Rule 23(b)(1)(B) class action, adjudications with respect to individual members would as a practical matter dispose of the interests of the absent members or substantially impair or impede their ability to protect their interests. At best, then, notice provides absent members with an opportunity to monitor the representation of their rights. In such cases, we think that due process is satisfied if the procedure adopted "fairly insures the protection of the interests of absent parties who are to be bound by it."
*Id.* (quoting *Hansberry v. Lee*, 311 U.S. 32, 42, 61 S.Ct. 115, 118, 85 L.Ed. 22 (1940)).

**13.** Estate's reliance on *Schrader v. Selective Service Sys. Local Bd. No. 76*, 470 F.2d 73 (7th Cir.), *cert. denied*, 409 U.S. 1085, 93 S.Ct. 689, 34 L.Ed.2d 672 (1972), which followed the dicta in *Eisen II* in a(b)(2) class action, is unavailing, as that case no longer reflects the law even in the Seventh Circuit. *See, e.g., Bijeol v. Benson*, 513 F.2d 965, 968 n. 3 (7th Cir.1975); *Williams v. Lane*, 129 F.R.D. 636, 640 n. 7 (N.D.Ill.1990) (*Schrader* "is simply not good law today").

are not capable of having carefully and adequately assessed the situation at this point and that this court needs the additional help of further briefing on a motion already over-briefed and when we are experienced in class actions and have the benefit of much precedent in this Circuit.[14] In these cases, moreover, we do not have simply one, two or a handful of class representatives, but rather over 100 individuals who were randomly selected and have been personally served. It is difficult to believe that notice of these actions sent to even additional individuals would result in their finding something critical that has been overlooked by this already large number of class members, many of whom, moreover, have hired their own attorneys. The evidence we have shows that the average absent class member owns or owned a small number of shares in the trusts which would make intervention unlikely. Moreover, these cases do not mainly involve factual disputes but, rather, will turn on principles of law to be construed by the court. The court will hardly need further briefing on those issues after the many able counsel involved have done so.

The remote possible benefit of requiring notice and an opportunity to opt out at this point is far outweighed by the certain detrimental effects such would have on the cases. To be sure, it would further greatly delay an already delayed action. Many of the class members are elderly, having invested in the trusts many years ago and having awaited resolution through an inordinately elaborate judicial process in the state and federal courts. Moreover, to require notice would require a substantial cost to the Funds, further depleting an already inadequate limited amount available for distribution at this time. (It could, furthermore, result in the appearances of even more lawyers who would have very little to add to the case but might cause further delay and then seek to be paid fees out of the Funds.) Moreover, to the extent

some individuals might elect to opt out, the individual separate suits they might bring would undermine the purposes for which certification under Rule 23(b)(1) should be granted that we have already discussed. The same reasons that militate in favor of certifying these classes under the Rule militate against allowing individual actions in the guise of opt-out actions.[15]

Thus, for *all* of the foregoing reasons the plaintiffs' motions for class certification should be granted and notice not required at this time.

### COUNSEL MOTIONS

■ The remaining issue is the motions for appointment of counsel for the three classes in each action. Not only is appointment of appropriate class counsel one of the court's inherent powers under Fed.R.Civ.P. 23(d)(1) to assure the litigation will be conducted with a minimum of confusion and expense, *Cullen v. New York State Civil Service Commission,* 435 F.Supp. 546, 563–64 (E.D.N.Y.), *appeal dismissed,* 566 F.2d 846 (2d Cir.1977); *Percodani v. Riker–Maxson Corp.,* 51 F.R.D. 263 (S.D.N.Y.1970), *aff'd sub nom. Farber v. Riker–Maxson Corp.,* 442 F.2d 457 (2d Cir.1971), but, as discussed earlier, a review of adequacy of counsel is essential to the issue of class certification because it is critical to the determination of whether the interests of the class will be fairly and adequately protected under Fed.R.Civ.P. 23(a)(4) (*see* authorities cited at page 16, above). Among the factors generally considered are: the attorney's experience; the attorney's skills and acumen; the attorney's resources, including staff; the attorney's reputation in the field; and the attorney's performance through the litigation to date. In addition, counsel's adequate representation of a class in the past is good evidence that she will adequately represent a class now. *See Ikonen v. Hartz Mountain*

---

14. As indicated earlier, I have given these actions much careful consideration and, indeed, already required the cases to be repleaded twice to change the class delineations so as to ameliorate the problems I felt might possibly be posed. These cases, moreover, will have the benefit of not just my consideration, but also your Honor's own independent thorough consideration, afford-

ing them the infrequent benefit of not just one but two judges' thinking on the matter.

15. As the case progresses, the Court will, in any event, continue to monitor whether notice to class members would be required or useful.

*Corp.*, 122 F.R.D. 258, 263 (S.D.Cal.1988); *Gomez v. Illinois State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D.Ill.1987); *Klein v. A.G. Paribas, Inc.*, 109 F.R.D. 646, 652 (S.D.N.Y. 1986); *Sullivan v. Chase Inv. Servs.*, 79 F.R.D. 246, 258 (N.D.Cal.1978); *Cullen v. New York State Civil Service Commission*, 435 F.Supp. 546, 563–64 (E.D.N.Y.), *appeal dismissed*, 566 F.2d 846 (2d Cir.1977). *See generally* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.07[1.–1] at 193–97 (2d ed. 1995); Wright, Miller & Kane, *Federal Practice & Procedure*: Civil · 2d § 1769.1 at 374–83 (1986). In choosing a lead counsel, as this court has stated, "the overriding interest of the Court ... is the vigorous protection of the rights of the ... class." *Percodani v. Riker–Maxson Corp.*, 51 F.R.D. at 265.

■ In both the *U.S. Trust* and *Investors* actions, the motions for appointment of lead counsel are endorsed and/or not contested by plaintiffs or any other parties, except with respect to the Continuous Holder class. I note that, in general, the court should encourage and approve selection of lead counsel by agreement of interested counsel, imposing its own choice only in "extraordinary situations." *See* 2 H. Newberg, *Class Actions* § 9.35 (3d ed. 1992); *Wellman v. Dickinson*, 79 F.R.D. 341, 348 (S.D.N.Y.1978). On the other hand, the court has very great discretion which, absent "exceptional circumstances ... should be left untouched by the appellate court." *Cullen v. New York State Civil Service Commission*, 566 F.2d 846, 849 (2d Cir. 1977).

*U.S. Trust*

In the *U.S. Trust* action, the following motions for appointment are now before us.

*Class A. Current Holders.* The firm of Haight, Gardner, Poor & Havens, by John K. Weir, Esq., presently representing current holder representative Robert Haserot, seeks appointment as lead counsel for Class A.

The firm has been actively involved since service of the complaint on Haserot. No other attorney has filed any notice of appearance, answer or motion for appointment with respect to the class, and the motion is not contested by any other party. Based on a thorough review of their submissions in support of the motion, I find Weir and the firm extremely well qualified under the standards summarized above and recommend the appointment.

*Class B. Former Holders.* The firm of Jacobson & Triggs, by John F. Triggs, Esq., seeks appointment as lead counsel for Class B. Christopher C. Lovell, Esq., seeks appointment as co-counsel for the class. Jacobson & Triggs (a very small firm), jointly with Lovell, currently represent nine of the named class representatives. They were the first to file an answer to the complaint on behalf of any defendant in this case and have both been actively involved since. No other counsel seeks appointment, and no objection to their appointment has been received. I have fully reviewed their submissions, including looking into references provided by them at plaintiffs' attorneys' request.[16] Based on my review, as well as the quality of their representation herein to date and my own past experience with their work on other cases before me, I find them fully capable as well and recommend their appointment to represent the class.

■ *Class C. Continuous Holders.* Two firms seek appointment as lead counsel for Class C, Shapiro Grace Haber & Urmy (of Boston, Mass.), by Edward F. Haber, and Shea & Gardner (of Washington, D.C.), by Stephen J. Pollak.[17] Shapiro Grace represents continuous holder representative Estate of Leatrice Amsterdam, and Shea & Gardner represents seven continuous holders (known as the "Weinreb defendants"). Plaintiffs oppose the appointment of Shapiro Grace, asserting that part of the firm's stated intended strategy in the case presents a "conflict of interest," and therefore request

---

**16.** Prior to the filing of any motions for appointment, I told plaintiffs' counsel that I expected them to review and respond to the motions to aid the court in its assessment.

**17.** Although both firms are out-of-town, they have so far worked actively with New York counsel, and I see no problem or potential meaningful additional expense to the class occasioned by their locations (which are, in any event, both within the "Northeast Corridor").

that Shea & Gardner be appointed. Plaintiffs' contention, however, is mistaken, and I see no problem presented. Indeed, it should be noted that Shea & Gardner, although also seeking the appointment, has responded to plaintiffs' opposition to Shapiro Grace by, in essence, endorsing the general theory of Shapiro Grace's intended strategy that plaintiff faults. Shea & Gardner says that plaintiffs' position is erroneous and that it is concerned that the court in ruling on the appointment motions not inadvertently endorse plaintiff's position which would be *contrary* to the interests of the class at this point.

I should note at the outset that both firms are highly qualified to act as lead counsel for the class. Briefly, Shapiro Grace has extensive experience in prosecuting class actions, including as lead counsel. Haber himself, who has litigated in federal courts across the country for 25 years, recently concluded co-lead representation of derivative plaintiffs and the class in an action against US West in the United States District Court for the District of Colorado which ended in settlement. In approving the settlement, involving a potential 1.5 million class members and shareholders, the court stated the settlement was an arm's-length one "negotiated by skilled and experienced attorneys in light of complex facts in a somewhat complex and novel context." *US West v. MacAllister,* [1992] Fed. Sec.L.Rep. ¶ 97,269 (CCH), 1992 WL 427772 at *10 (D.Colo. Dec. 18, 1992). The court praised counsel further:

> ... Counsel who have been involved in this case come with a wealth of experience and skill in prosecuting class actions, derivative actions in the field and have expanded this skill and experience to address the rather novel issues that have been presented here.

*Id.,* 1992 WL 427772 at *14. Haber, as well as the others in his firm, have impressive academic and professional credentials, including teaching and lecturing on securities litigation and other areas.

The experience, qualifications and academic and professional credentials of Stephen J. Pollak and others at Shea & Gardner who would assist in this case are no less impressive. Moreover, the firm regularly provides advice on disclosure and compliance issues on the securities laws to depositors of unit investment trusts, which would no doubt help it in understanding and analyzing at least some of the issues that may be faced in this action. There is no doubt that both Shea & Gardner and Shapiro Grace have the qualities noted as necessary for lead counsel by the Manual for Complex Litigation, Second, § 20.224 at 20 (1985): ability, commitment and resources. Mindful of the fact, however, that this case does not need co-lead counsel, which would only cost the class members additional fees and expenses and further deplete the Funds (as I informed counsel at our first conference), I recommend that Shapiro Grace be appointed by the court.

My decision is based quite largely on the fact that Shapiro Grace also represents the only class representative named for the Continuous Holder class in the *Investors* action. Shapiro Grace states that it can therefore represent Class C in both *U.S. Trust* and *Investors* at substantially lower cost than would be occasioned by the firm's representation of that class in *Investors* and representation by a wholly different firm of lawyers of the class in *U.S. Trust.* As discussed earlier, most of the issues in these cases are the same or similar, and I agree that representation by separate counsel would occasion much duplication of work and be a wholly unnecessary drain on the interpleaded funds available.[18]

Plaintiffs' opposition to the appointment of Shapiro Grace stems from the fact that Haber has stated that he has concluded that a motion for summary judgment against the Former Holder class would be in the best interest of the Continuous Holders and of the efficient progression of the case. Indeed, Shapiro Grace has circulated to counsel and the court a draft of a summary judgment brief it has prepared, contending that the Former Holder class is not entitled to any

---

18. Shapiro Grace should be cautioned now and advised that the court will scrutinize carefully any fee application that may eventually be made in light of Shapiro Grace's assertion as to substantial cost-saving and my expectation that it should be correct.

share in the Fund as a matter of law. Plaintiffs claim that "Mr. Haber, by taking sides in a controversy in whose outcome some, at least, of the Continuous Holders have a different interest, has, in effect, disqualified himself and his firm from representing the Continuous Holders." Memorandum of Plaintiffs in Response to Motions by Various Counsel for Appointment as Counsel for Defendant Classes at 6. Plaintiff's view is based on their belief that "[s]ome of the members of the class of Continuous Holders would be better served if the Current Holders won; some of the members of the class of Continuous Holders would be better served if the Former Holders won." *Id.* at 4. However, their contention relies on a mistaken interpretation of the current posture of the defendant classes. As discussed earlier, when plaintiffs redrafted the original complaint, which had named only two defendant classes, to add the Continuous Holders as a third class to meet the concerns I had expressed to them, I found their definition of that third class also presented a problem. After further discussion with all counsel, plaintiffs changed their proposed definition of Class C to the form we now have. In short, the problem presented by their proposed definition of the class of Continuous Holders was that it would have included claimants who, after June 15, 1983, sold the units they had bought prior to that time but then also bought additional units after June 15, 1983 which they still held on the Record Date. As I told counsel at that time, "such a person *should* be a member of Class A with respect to the latter units and a member of Class B with respect to the former, but not a member of Class C" because "the classes should be 'mutually exclusive' as to units transacted" to avoid a conflict problem. Letter to All Counsel, May 17, 1993, at 1. While under their proposed definition a Continuous Holder could have been someone who bought prior to June 15, 1983 and held the same units on the Record Date, she also could have been someone who sold some or all of those units after June 15, 1983 (making her a member of the Former Holder class for those) but bought new ones which she still held on the Record Date (making her a member of the Current Holder class for those). While that definition would have made "Continuous Holders" people who were in actuality members of the Former and Current Holder classes, the complaint now in this action does not. A Continuous Holder is only someone who bought before June 15, 1983 and held the *same units* on the Record Date. The very point of the new and present definition was to protect against conflict for a true Continuous Holder with respect to those *continuous* shares and ensure vigorous representation by the Continuous Holder class representatives and their counsel.

It is important to note that the class *representatives* of each class are members *only* of their particular class and not of either of the others, and will pursue recovery for that class alone with all vigor. To the extent a nonrepresentative member of the Continuous Holder class, however, sold some shares before the Record Date, she will also be a member of the Former Holder class with respect to those, and to the extent additional shares were bought after June 15, 1983 and held on the Record Date together with shares bought prior thereto, she will be a Current Holder on the later shares. But the "Continuous" units are in a different category from either the Former or Current. Plaintiffs' contention rests on the view that they are not, but could be also Former or Current shares—a scenario which would only have been the case under their original, now discarded, definition of that class.

Plaintiffs state that they expected the Continuous Holder class to play a "passive" role and expected that counsel for that class would "refrain" from taking sides in the dispute between the Current and Former classes. In support of their contention that Shapiro Grace has "disqualified" itself by doing otherwise, plaintiffs extensively quote the letter they sent to me in which they proposed their original Continuous Holder class that was rejected. Thus, they say as follows:

[W]e expect that if the core dispute between the "current" and "former" holders is litigated to a conclusion, the [continuous] holder class representatives will properly insist that their class be taken into consideration when the judgment is entered,

since under one hat or the other all the members of the [continuous] holder class are entitled to participate in the recovery on equal terms with the prevailing class no matter which of the other two classes is the prevailing class.

Letter to the Court, April 12, 1993, at 5. This is simply not the case. All the class members are not entitled to participate in the recovery on equal terms with either of the other two classes, and some Continuous Holders, if not most, will *not* be members of either of the other classes.

To the extent a Continuous Holder may also be a Current or Former Holder *with respect to other units,* she may have a greater interest that the Current or the Former class prevails rather than the Continuous class. *But she is in no different position than any member of the Current or the Former class may be with respect to being a member of another class as well.* There will be, undoubtedly, persons who bought prior to June 15, 1983 and sold thereafter, perhaps to cut their losses or for other reasons (a Former Holder) and then, believing the price of the units to be good for purchase, bought some more down the road and held them on the Record Date (also a Current Holder). Which class such a person would prefer will depend upon the number of units involved and prices at the relevant times. In other words, members of each of the three classes herein may also be members of another class with respect to certain units; the situation is simply not limited to members of the Continuous Holder class. Each class, however, represented by persons who are *not* members of any other class, will argue vigorously that it should receive the Fund and not either of the other two classes. Each is entitled to counsel who will do so. The fewer persons or units as to which the Fund will be divided, the greater the recovery for each prevailing claimant. That is the point of this action. A member of one class who is also a member of another class with respect to other shares may simply sit back and recover on those shares which the court eventually decides are entitled to recovery. In the meantime, each

class through its representatives and counsel equally will try to prevail over the others to maximize recovery for that class, and a person will recover or not on the appropriate units in whatever class *those* units place her.

Without intending to express any view at this time as to the merits of Shapiro Grace's proposed summary judgment motion or the wisdom of its strategy, I note that it shows thought and vigorous pursuit of what counsel believes is in the best interest of the class. There is little doubt that the Continuous Holder class is entitled to the Fund; the issue is whether it must share the Fund with either of the other classes. Its counsel should not be precluded or its strategy limited because prejudged by the court at this stage of the case. As even Shea & Gardner argues in seeking to be appointed lead counsel, "[w]hile the Weinreb defendants will seek to pursue a claim that gives the Continuous Holder Class rights superior to the other two classes, they should not be precluded from advocating a theory that favors one or the other defendant class should that prove necessary for maximizing the per-unit recovery of the Continuous Holder Class." How this case should proceed and how the dispute among the classes as to the rights to the Fund will be resolved are determinations for the court to make at the appropriate times in this action after hearing from all parties with a stake in the outcome. They are certainly not determinations to be made by plaintiffs (whose primary interest is simply to deposit the monies and be dismissed from the case).[19]

■ The final item for consideration is an application submitted by James E. Daniels, Esq., who represents one of the continuous holders, Bertha Daniels. He does not seek appointment as lead counsel but applies "to serve as an attorney for the class" to aid lead counsel. He further requests that "[a]t a minimum," the fees and expenses incurred by Ms. Daniels in connection with his representation of her to date be awarded out of the interpleaded Fund "at an early juncture." Plaintiffs oppose the application, and I agree with them and recommend the application be

---

19. Having said the above, I do wish to stress that I am sincerely grateful to plaintiffs' counsel for the assistance they have given and remain willing to give the court.

denied. There is no reason for the appointment of additional counsel that would increase depletion of the Fund. *See, e.g., Percodani v. Riker–Maxson Corp.*, 51 F.R.D. at 265. The class, as discussed above, will be quite adequately represented by counsel of high caliber. If Ms. Daniels, for reasons of her own, wishes to have her own attorney as well, she is free to do so, but there is no reason the class need pay additional expense that appears wholly unnecessary at this point.[20]

In sum, for the foregoing reasons, I recommend that Shapiro Grace Haber & Urmy be appointed lead counsel for Class C, the motion of Shea & Gardner for appointment as lead counsel be denied and the application of James E. Daniels, Esq. for appointment as additional class counsel be denied.

*Investors*

In the *Investors* suit, unlike the *U.S. Trust* action, there is only one named representative for each defendant class. Each has retained counsel who move for appointment to represent the respective class.

*Class A. Current Holders.* The firm of Winston & Strawn, by Edward N. Meyer, Esq., attorneys for current holder representative Janet C. Jenner seeks appointment for Class A. There has been no objection filed to the motion, and a review of the application, including the letters of reference received, shows Winston & Strawn well qualified to the task. Meyer has been practicing in the federal courts in New York since 1968. He, Terry W. Grimm, Esq., who also would work on the matter, and the firm have experience in interpleader suits and class action litigation, representing both class action plaintiffs and defendants. They clearly have the resources to handle the task.

*Class B. Former Holders.* The firm of Fiorenza & Hayes, S.C. (of Milwaukee, Wisc.) and its local counsel Brown Raysman & Millstein, attorneys for former holder representative Thomas B. Bachhuber, seek appointment to represent the class. Again, the application is unopposed, and my review

shows appointment is warranted. Without belaboring the point, the attorneys at each firm who would be responsible for handling this action are clearly experienced, capable and qualified to represent the class herein. My only hesitation lies in the fact that it would seem there are too many of them: two members of Brown Raysman & Millstein and two members and one associate of Fiorenza & Hayes. Representation of this class in this action would not appear to warrant the services of at least five lawyers. I do not, however, think it appropriate or desirable to dictate to counsel how they should staff the case, and I have no problem if even more attorneys at the firm are involved down the road. The only problem I would have is if, when the time comes that fee applications are submitted, the amount requested is larger than need be only because of an excess in the number of individuals who spent time on the matter (which could arise, for example, because they need carry on excess discussions about the case so all involved are "up-to-date" or so they can "bat around" ideas with five heads instead of two or three). Counsel thus being forewarned, I recommend their appointment.

*Class C. Continuous Holders.* As discussed earlier in connection with my recommendation for appointment of Shapiro Grace Haber & Urmy as lead counsel for the Continuous Holder class in the *U.S. Trust* action, Haber and the firm also represent Howard R. Stevens, the only named representative for Class C in this case and seek appointment as counsel for the class herein. Their professional qualifications and ability to conduct such litigation have already been set forth. The motion for appointment stands unopposed except by plaintiff who opposes it for the same reasons expressed by plaintiffs in *U.S. Trust—i.e.*, Haber's intention to move for summary judgment against the Former Holder class. (Plaintiff does not fault Shapiro Grace's qualifications; to the contrary, plaintiff explicitly states that Haber and the firm "are experienced and competent class

---

20. Mr. Daniels' request for fees and expenses to date is not something we need to take up. Apart from the one sentence request, he submits no specific monetary request or any support, and I do not understand him to be applying in that regard at this time. (Indeed, it would not be proper for him to do so at this time in any event.)

action litigators." Plaintiff's Reply to Motions for Orders Approving Attorneys for Various Classes at 3.) For precisely the reasons I recommend their appointment as lead counsel for the class in the *U.S. Trust* action, as discussed at length above, I also recommend their appointment for the class herein.

## CONCLUSION

For the reasons set out above, I recommend that you enter an order providing that:

(1) Each action may be maintained as a class action.

(2) The following three defendant classes are certified in 92 Civ. 9393 (the *U.S. Trust* action):

Class A. Current Holders: Persons who acquired units of one or more of plaintiffs' trusts after June 15, 1983 and held the same units on a date settlement distributions from *In re Washington Public Power Supply System Securities Litigation,* pending in the United States District Court for the District of Arizona under Docket No. MDL 551, were received by plaintiff trustee ("Record Date") or, if such trust had previously been terminated, on such trust's termination date ("Termination Date").

Class B. Former Holders: Persons who acquired units of one or more of plaintiffs' trusts on or before June 15, 1983 and disposed of the same units before any Record Date or the Termination Date.

Class C. Continuous Holders: Persons who acquired units of one or more of plaintiffs' trusts on or before June 15, 1983 and held the same units on a Record Date or the Termination Date.

(3) The following counsel are appointed lead counsel for the above classes in 92 Civ. 9393:

Class A: Haight Gardner Poor & Havens 195 Broadway New York, New York 10007

Class B: Jacobson & Triggs 52 Duane Street New York, New York 10007

Christopher C. Lovell, Esq. 52 Duane Street New York, New York 10007

Class C: Shapiro Grace Haber & Urmy 75 State Street Boston, Massachusetts 02109

(4) The motions of Shea & Gardner and James E. Daniels, Esq. for appointment are denied.

(5) The following three defendant classes are certified in 93 Civ. 3935 (the *Investors* action):

Class A. Current Holders: Persons who acquired units of plaintiff's trust after June 15, 1983 and held the same units on a Record Date.

Class B. Former Holders: Persons who acquired units of plaintiff's trust on or before June 15, 1983 and disposed of the same units before any Record Date.

Class C. Continuous Holders: Persons who acquired units of plaintiff's trust on or before June 15, 1983 and held the same units on a Record Date.

(6) The following are appointed lead counsel for the above classes in 93 Civ. 3935:

Class A: Winston & Strawn 175 Water Street New York, New York 10038

Class B: Fiorenza & Hayes, S.C. 3900 West Brown Deer Road Milwaukee, Wisconsin 53202

Brown Raysman & Millstein 120 West 45th Street New York, New York 10036

Class C: Shapiro Grace Haber & Urmy 75 State Street Boston, Massachusetts 02109

After you enter an order, I will establish a schedule for the completion of limited discovery and submission of dispositive motions. Counsel have been generally quite cooperative, and I believe matters can now move quickly toward resolution.

Copies of this Report and Recommendation were mailed this date to the parties of record at this time as shown on the following page.

The parties are hereby directed that if you have any objections to this Report and Recommendation you must, within ten (10) days from today, make them in writing, file them with the Clerk of Court and send copies to the Honorable Kimba M. Wood, to the opposing party and to the undersigned. Failure to

file objections within ten (10) days will preclude later appellate review of any order that will be entered by Judge Wood. *See* 28 U.S.C. § 636(b)(1); Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure; *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983) (per curiam).