UNITED STATES TRUST COMPANY OF NEW YORK, The Bank of New York, and The Chase Manhattan Bank, N.A., as trustees of certain unit investment trusts, Plaintiffs,

v.

Steven L. ALPERT, et al., and Isaac T. Avery, Jr. et al., and Dale D. Ackerman, et al., Defendants.

INVESTORS FIDUCIARY TRUST COMPANY, as Trustee of the Kemper Tax–Exempt Income Trust, Plaintiff,

v.

Janet C. JENNER, et al., and Thomas B. Bachhuber, et al., and Howard R. Stevens, et al., Defendants.

Nos. 92 Civ. 9393 (KMW), 93 Civ. 3935(KMW).

United States District Court, S.D. New York.

March 30, 1998.

Jack Kaplan, Carter, Ledyard & Milburn, New York City, Richard B. Dannenberg, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, for U.S. Trust Co., Plaintiff.

Richard B. Dannenberg, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, Ellen J. Bickal, Emmet, Marvin & Martin, New York, NY, for Bank of New York, Plaintiff.

Richard Tufaro, Milbank, Tweed, Hadley & McCloy, New York, NY, Kent T. Stauffer, Kent T. Stauffer, New York, NY, Jack Kaplan, Carter, Ledyard & Milburn, New York City, Richard B. Dannenberg, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, for Chase Manhattan Bank (National Association), Plaintiff.

John K. Weir, Mark A. Saunders, Haight Gardner Holland & Knight, New York, NY, for Robert Haserot, Defendant.

John K. Weir, Haight Gardner Holland & Knight, New York, NY, for Steven L. Alpert, Marianne Brachfield, Roger Brandwein, Mary C. Christoffel, Robert J. Christoffel, Dana Dangelo, Charles Fischer, Hugh A. Galloway, Patricia S. Gallucci, Nathan Grodstein, Edward F. Huntington, Defendants.

John F. Triggs, Camhy, Karlinsky & Stein, LLP, New York, NY, for Isaac T. Avery, Jr., Annabel R. Bogdonoff, Leonard Romanik, Carlton G. Thomas, Margaret West, Goldie Miller, Frances M. Neyland, Roland R. Neyland, Glenn Palmer, Defendants.

Christopher Lovell, Lovell & Stewart, LLP, New York, NY, for Sandra Clementi, Defendant.

Christopher Lovell, Lovell & Stewart, LLP, New York, NY, John F. Triggs, Camhy Karlinsky & Stein, LLP, New York, NY, for Donald J. Phillips, Ralph E. Phillips, Wilton J. Benolt, Robert W. Bernthal, Jane S. Dowdall, John B. Mantonya, Stanley A. Maple, Pauline D. Raymond, Earl W. Rogers, Defendants.

Edward F. Haber, Shapiro, Grace, Haber & Urmy, Boston, MA, for Helen Berlin, Betty Ann Blumenthal, Bedford Chapin, Martha J. Clark, Cynthia Wood Daniels, Defendants.

## ORDER

KIMBA M. WOOD, District Judge.

Plaintiff Trustees (the "Trustees" or "plaintiffs") of various unit investment trusts (the "Trusts") bring these two interpleader actions (93 Civ. 9393 and 93 Civ. 3935 will be referred to herein as "*U.S. Trust* action" and "*Investors Fiduciary* action," respectively) to determine which of three defendant classes of investors in the Trust—Current Holders, Former Holders and Continuous Holders— are entitled to monies paid to the Trusts in settlement of securities fraud claims arising from the default of bonds held by the Trusts. I referred this case to Magistrate Judge Sharon E. Grubin for general pre-trial case management and dispositive motions. Each of the defendant classes now moves for summary judgment in both actions. In addition, plaintiff U.S. Trust moves for summary judgment dismissing the counterclaims of the Current Holders in Action One.

In a Report and Recommendation dated December 17, 1997 (the "Report"), Magistrate Judge Sharon E. Grubin recommended, in each of the two interpleader actions, that I deny the summary judgment motion of the Former Holders and grant the summary judgment motions of the Current Holders and the Continuous Holders and award them the interpleaded settlement proceeds (the "interpleaded Fund"), to be distributed according to their pro rata shares as determined under the Indentures. Magistrate Judge Grubin further recommended that I

grant plaintiff U.S. Trust's motion for summary judgment on the Current Holders' counterclaims for breach of contract and fiduciary duty. Defendants Former Holders and Current Holders in Action One have filed timely objections to portions of the Report, to which plaintiffs and defendants Continuous Holders and Current Holders have responded. Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, I review *de novo* those portions of the Report to which defendants object. For the reasons stated below, I adopt the Report, attached hereto, in all respects.

### I. *Discussion*

The facts of the case are thoroughly discussed in Magistrate Judge Grubin's Report and Recommendation, familiarity with which is assumed. Defendant Former Holders in each of the actions and Defendant Current Holders in the *U.S. Trust* action have all filed separate objections, which I consider in turn.

### A. *The Report and the Former Holders' Objections*

In Magistrate Judge Grubin's careful and comprehensive Report, she concludes that, under the terms of the trust indentures involved in both actions, "the interpleaded Fund must be distributed to members of the Current Holder and Continuous Holder classes, who were the owners of record of units in the Trusts on the applicable Record Dates when the Trusts came into possession of the distributions from the settlement funds." (*See* Report at 17.)

Defendant Former Holders in Action One "generally object" to the Report, repeating the arguments made in their motion papers (*see* FH1 Objs. at 4–5); they reiterate their position that principles of equity, the "provenance" of the interpleaded Funds, language in some of the indentures, and Second Circuit law concerning the non-assignability of fraud claims, all militate in favor of awarding the interpleaded Fund to the Former Holders. Similarly, the objections of defendant Former Holders in the *Investors Fiduciary* action were raised in their motion papers. They now place particular emphasis on "sig-

nificant language" in the Trust documents and Second Circuit law, which they contend establishes that proceeds from the settlement of the securities fraud claims belong to the Former Holders, "who acquired ownership rights in the trusts and bonds deposited in the Trust Funds." (*See* FH2 Objs. at 6–7; 8–19.) These defendant Former Holders also reassert that the principles of *res judicata* and equity weigh in favor of their summary judgment motion, referring the Court to their motion papers for elaboration of their positions. (*See* FH2 Objs. at 19–23.)

After a thorough review of all of the Former Holders' objections to this recommendation, I find that the Former Holders have merely repeated the arguments made in their briefings of the underlying motions, all of which were fully considered and rejected by Magistrate Judge Grubin.[1] (*See* Report at 17–35.) Because I agree with the reasoning and conclusions of Magistrate Judge Grubin's Report, I hereby adopt her recommendation that I deny the summary judgment motions of the Former Holders, and grant the summary judgment motions of the Current Holders and Continuous Holders, awarding them the interpleaded Fund, to be distributed according to their pro rata shares as determined under the indentures.

### B. *The Report and the Action One Current Holders' Objections*

Magistrate Judge Grubin further recommended that I grant the summary judgment motion of plaintiffs as to defendant Current Holders' counterclaims for breach of contract and fiduciary duty in the *U.S. Trust* action, on the basis of her determination that the counterclaims "fail as a matter of law."

Magistrate Judge Grubin found that because the plaintiff Trustees acted within the rights granted to them by law in bringing their interpleader action, no cause of action arises from their commencement of this action. (Report at 38–39, 44.) She further indicates—in dicta—that even if the Current Holders were deemed to have stated a claim, they have "neither raised any genuine issue of material fact nor shown how further discovery could do so at all." Therefore, she concludes, summary judgment should be granted to plaintiffs as to defendant's counterclaims in any event.

In their objections to Magistrate Judge Grubin's recommendation, defendant Current Holders maintain that material issues of fact preclude summary judgment on their counterclaims. Although essentially repeating arguments made in their moving papers, defendant Current Holders do include in their objections a more focused discussion of their bases for concluding that a cause of action does arise under the circumstances of the instant case. They emphasize that interpleader actions may be commenced only where trustees face a "real and reasonable fear of double liability" and indicate that the terms of the indentures, the Investment Company Act of 1940 (the "1940 Act"), and the "limited discovery" they have obtained do not support such a fear. (*See* CH Objs. at 14, 17.) In addition, defendant Current Holders contend that the Report failed to address "a mixed question of law and fact . . . as to 'whether the Trustee's "right" to commence a statutory interpleader supersedes the statutory mandate of Section 26(a) of the . . . 1940 Act.'" (*See* CH Objs. at 1–2.)

---

1. One possible exception is the "issue of the previously terminated unit trusts," raised in the fourth objection of defendant Former Holders in the *U.S. Trust* action. Former Holders claim that there is no legal basis for awarding any of the interpleaded Fund to Current Holders of units in Unit Indenture Trusts terminated prior to the distribution of the settlement fund to the Trustees. After a full review of the parties' submissions on this issue, I find that this objection has no merit. As the Continuous Holders in the *U.S. Trust* action note in their submissions, a trust does not automatically terminate upon notice of revocation under New York law; there is a "winding up" period during which final ac-

counting and conveyance of property occurs. *Neary v. City Bank Farmers Trust Co.,* 260 A.D. 791, 24 N.Y.S.2d 264, 267 (1940); *see also In Re Estate of Townsend,* 23 Misc.2d 70, 198 N.Y.S.2d 868, 870 (1960) (even after termination date duties of trustee did not then terminate "but continued until division and distribution of the income and corpus"). Former Holders in the *U.S. Trust* action cite no authorities to the contrary, nor have I found any such authority in my research. In sum, this fourth objection of the *U.S. Trust* Former Holders does not dissuade me from concluding that the interpleaded Fund should be distributed as recommended by Magistrate Judge Grubin.

After a full consideration of defendant Current Holders' objections, I find that they have no merit and conclude that Magistrate Judge Grubin correctly determined that plaintiff Trustees' motion for summary judgment as to defendant Current Holders' counterclaims should be granted. In reaching this conclusion, I note in particular that defendant Current Holders have failed to establish that material questions of fact remain in dispute as to whether plaintiffs Trustees had a "real and reasonable fear of double liability or vexatious, conflicting claims." *Washington Elec. Coop., Inc. v. Paterson, Walke, & Pratt*, 985 F.2d 677, 679 (2d Cir. 1993). Under Rule 22 of the Federal Rules of Civil Procedure, an interpleader is available when a stakeholder "is or may be exposed to double or multiple liability." Fed. R.Civ.P. 22; the stakeholder who "legitimately fears multiple [liability] directed against a single fund" may properly bring an interpleader action "regardless of the merits of the competing claims." *6247 Atlas Corp. v. Marine Ins. Co., Ltd.*, 155 F.R.D. 454, 461 (S.D.N.Y.1994) (quoting *John v. Sotheby's*, 141 F.R.D. 29, 33 (S.D.N.Y.1992)). The evidence proffered by defendant Current Holders does not provide any reason for departing from Magistrate Judge Grubin's sound conclusion that plaintiff Trustees were well within their rights in bringing this interpleader action. Moreover, I would add that defendant Current Holders have offered no authority in support of the proposition that the right to commence a federal interpleader action is somehow qualified by "other contractual duties or applicable statutory provisions," (*see* CH Objs. at 18.), nor have I found any such authorities in my own research.

Finally, I note that defendant Current Holders have not sufficiently demonstrated that an additional period of discovery is warranted at this stage of the proceedings;[2] their submissions do not satisfy the requirements under Rule 56(f) of the Federal Rules of Civil Procedure. *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994). The Second Circuit Court of Appeals requires a party proceeding under Rule 56(f) to submit an affidavit, the sufficiency of which is determined by applying a four-prong test. The affidavit must (1) include the nature of the uncompleted discovery; (2), show how the facts sought are reasonably expected to create a genuine issue of material fact; (3) indicate what efforts the affiant has made to obtain those facts; and (4) explain why those efforts were unsuccessful. *Id.* After reviewing defendant Current Holders' submissions, I find that they fail to meet this test and are particularly deficient as to the fourth prong of this test.

Accordingly, I conclude, for the reasons stated by Magistrate Judge Grubin in her Report, that plaintiff Trustees' motion for summary judgment as to defendant Current Holders' counterclaims should be granted.

As a final note, I consider defendant Current Holders' request that, in the event the Court grants plaintiff Trustees' motion for summary judgment as to their counterclaims, the Court strike pages 40–47 from the Report, "on the grounds that it is *dicta* which is inaccurate and unwarranted, and which unnecessarily obfuscates the issues related to the counterclaims and the Trustees' motions for summary judgment with respect thereto." Because I do not find Magistrate Judge Grubin's discussion in this portion of the Report to be inaccurate, unwarranted or obfuscatory in any way, I deny defendant Current Holders' request.

## II. *Conclusion*

For the reasons set forth above, the Court adopts Magistrate Judge Grubin's Report in all respects. The summary judgment motions of the Former Holders in both actions are hereby denied and the summary judgment motions of the Current Holders and Continuous Holders in both actions are hereby granted. The interpleaded Fund is to be distributed to the Current Holders and Continuous Holders in both actions according to their pro rata shares as determined under the Indentures. The Court also grants plaintiff Trustees' motion for summary judgment

---

**2.** As Magistrate Judge Grubin noted in her Report, defendant Current Holders first raised this discovery issue after the completion of discovery,

in their memorandum in opposition to plaintiffs Trustees' summary judgment.

on defendant Current Holders' counterclaims in the *U.S. Trust* action. The Clerk of Court is directed to close this case. All pending motions are hereby moot.

SO ORDERED.

## REPORT AND RECOMMENDATION TO THE HONORABLE KIMBA M. WOOD

GRUBIN, United States Magistrate Judge.

These are two interpleader actions brought by the trustees (referred to herein as the "Trustees" when not referred to as "plaintiffs") of various unit investment trusts (the "Trusts") to determine which of three defendant classes, comprised of former and current investors in the Trusts, are entitled to the moneys paid to the Trusts in settlement of securities fraud claims arising from the default of bonds held by the Trusts. Adopting my Report and Recommendation of July 25, 1995, you previously certified pursuant to Fed.R.Civ.P. 23(b)(1) the three defendant classes in each action: Class A ("Current Holders"), Class B ("Former Holders") and Class C ("Continuous Holders"). *United States Trust Co. of New York v. Alpert,* 163 F.R.D. 409. Each of the defendant classes now moves for summary judgment. In addition, the three plaintiffs in 92 Civ. 9393 move for summary judgment dismissing counterclaims of the Current Holders.

## FACTUAL BACKGROUND

### A. MDL 551 Litigation

The facts underlying these actions were set forth in my Report and Recommendation dated July 25, 1995 and are repeated here only as necessary to understand the pending motions. Sometime between March 1, 1977 and January 22, 1982, all of the Trusts herein purchased Washington Public Power Supply System ("WPPSS") Generating Facilities Revenue Bonds (the "Bonds") issued to finance the construction of two nuclear power plants.[1] On January 22, 1982, WPPSS an-

nounced that construction of those plants would be halted because of cost overruns and other problems. Within months, several actions had been filed in Washington state courts which culminated in a June 15, 1983 decision by the Supreme Court of Washington holding that purported state guarantees of the Bonds were *ultra vires* and, hence, unenforceable. The Bonds went into default in July 1983. Thereafter, numerous bondholder class actions were filed against WPPSS and related entities pursuant primarily to Rule 10b–5 and other federal securities laws. They were consolidated under the Multi–District Litigation rules and the case, known as the "MDL 551 Litigation," was assigned to the Honorable William D. Browning in the United States District Court for the District of Arizona.

There were three categories of plaintiffs in the MDL 551 Litigation. Judge Browning certified two classes: (1) a Pre–Termination Class, which had purchased the Bonds between the date of their initial offering and cessation of construction of the nuclear plants on January 22, 1982, and (2) a Post–Termination Class, which had purchased the bonds between January 23, 1982 and June 15, 1983. In addition, Chemical Bank, in its capacity as the WPPSS Bond trustee, brought a separate class action for fraud, negligence and breach of contract on behalf of all persons who held or had held the Bonds. Because of the way the classes were defined, some bondholders in the Chemical Bank action, including the Trusts herein, were also members of one of the other two classes.

On December 22, 1987, Judge Browning dismissed the federal and state fraud claims of post-June 15, 1983 bondholders in the Chemical Bank action, rejecting the theory of those bondholders that purchasers of a bond receive an automatic assignment of tort claims held by prior bondholders. Citing *In re Nucorp Energy Securities Litigation,* 772 F.2d 1486, 1490 (9th Cir.1985), the court found that "such rights belong to persons who have been harmed by the misconduct of

---

1. WPPSS bonds comprised less than 8% of the holdings of the vast majority of the Trusts, and none held more than 10%.

others. They do not accompany securities as they move from holder to holder, but remain with the ones who claim injury." Order of Judge Browning dated December 22, 1987, p. 3. This left the post-June 15, 1983 bondholders with Chemical Bank's claim as trustee against WPPSS for a judgment in contract for the amount of principal and interest due on the defaulted bonds or for restitution and interest.

Eventually settlement of all claims in each action was reached with all defendants and a plan for allocation of the settlement fund was approved by Judge Browning. Appeals were taken, Judge Browning's decision was upheld, and, after the United States Supreme Court denied certiorari from the final appeal, Judge Browning authorized a distribution of the settlement proceeds to the plaintiff class members, including the Trustees herein. These distributions to the Trustees are hereinafter referred to as a whole as "settlement proceeds" or "the interpleaded Fund."

### B. *These Actions*

In these two actions, plaintiffs seek to have the court determine to whom they as trustees should pay these settlement proceeds. On December 29, 1992, United States Trust Company of New York, The Bank of New York and The Chase Manhattan Bank, N.A., as trustees for 335 unit investment trusts, filed the first of these two interpleader actions, 92 Civ. 9393 (the *"U.S. Trust"* action). On June 10, 1993, Investors Fiduciary Trust Company as trustee of eleven additional unit investment trusts (each of which is a series of the Kemper Tax–Exempt Trust) commenced the second action, 93 Civ. 3935 (the *"Investors"* action). Pursuant to the dictates of 28 U.S.C. § 1335, the plaintiffs deposited the settlement proceeds at issue with the Clerk of Court and they are now invested in short-term United States Treasury obligations pending the final determination herein. Plaintiffs brought these actions to have the court determine to whom they as trustees should pay the settlement proceeds on the theory that they were unable to determine safely to whom the Fund should be distributed and they were subject to litigation for breach of trust no matter what they decided.

The defendant classes we have certified are defined as follows:

Class A. Current Holders: Persons who acquired units of one or more of plaintiffs' trusts after June 15, 1983 and held the same units on a date settlement distributions from *In re Washington Public Power Supply System Securities Litigation,* pending in the United States District Court for the District of Arizona under Docket No. MDL 551, were received by plaintiff trustee ("Record Date") or, if such trust had previously been terminated, on such trust's termination date ("Termination Date").

Class B. Former Holders: Persons who acquired units of one or more of plaintiffs' trusts on or before June 15, 1983 and disposed of the same units before any Record Date or the Termination Date.

Class C. Continuous Holders: Persons who acquired units of one or more of plaintiffs' trusts on or before June 15, 1983 and held the same units on a Record Date or the Termination Date.

The definition in the *Investors* action is similar;

Class A. Current Holders: Persons who acquired units of plaintiff's trust after June 15, 1983 and held the same units on a Record Date.

Class B. Former Holders: Persons who acquired units of plaintiff's trust on or before June 15, 1983 and disposed of the same units before any Record Date.

Class C. Continuous Holders: Persons who acquired units of plaintiff's trust on or before June 15, 1983 and held the same units on a Record Date.

In moving for summary judgment, the Current and Continuous Holders argue that the express terms of the trust indentures, which provide that all money received by the Trustees be placed into an account which can be distributed only to those persons holding units as of the date the money was received, precludes distributing Trust property to Former Holders. The Former Holders, on the other hand, contend that the trust indentures do not provide a method for distribution of these settlement proceeds and that

since they, not the Current Holders, were the victims of the securities fraud, principles of equity and *res judicata* require that they receive them. The plaintiffs in *U.S. Trust* seek summary judgment dismissing the Current Holders' counterclaims for, *inter alia,* breach of contract and fiduciary duty. The facts in these actions are not in dispute, and all parties have agreed since their commencement that they are subject to final resolution on summary judgment.[2] For the reasons set forth below, I recommend denying the motion of the Former Holders, granting the motions of the Current and Continuous Holders and awarding them the interpleaded Fund, and granting the motion of the *U.S. Trust* plaintiffs on the Current Holders' counterclaims.

### C. Unit Investment Trusts

A unit investment trust is an investment vehicle that invests in a fixed portfolio of securities and sells redeemable interests ("units") in itself. *See Memorandum on the Regulation of Unit Investment Trusts from the Division of Investment Management to the Securities and Exchange Commission,* Fed.Sec.L.Rep. (CCH) ¶ 84,328 at 89,469 (September 22, 1988). Such a trust, like a mutual fund, is within the broad definition of an "investment company" under section 3 of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a–3 (1997). *Id.* at n. 1. A trust's three defining characteristics are set forth in section 4(2) of the 1940 Act, 15 U.S.C. § 80–4(2):

> "Unit Investment Trust" means an investment company which is (A) organized under a trust indenture, contract of custodianship or agency, or similar instrument, (B) does not have a board of directors, and (C) issues only redeemable securities, each of which represents an undivided interest in a unit of specified securities.

An investor ("unitholder") in such a trust fund is typically issued a Certificate of Ownership. Under section 2(32) of the 1940 Act, 15 U.S.C. § 80a–2(32), holders of "redeema-

ble securities," upon presenting their certificates to the trustee, have the right to receive their proportionate share of the trust's current net assets or the cash equivalent thereof ("net asset value"). Such trusts are attractive investments in large part because redeemable securities allow investors to liquidate them quickly and avoid many of the market's vagaries.

The trust indenture under which a unit investment trust is organized is a contract between a depositor (also called a sponsor) and a trustee. The depositor, usually a major investment firm, organizes the trust and assembles a fixed portfolio of securities which are then deposited with the trustee. *Memorandum on the Regulation of Unit Investment Trusts,* Fed.Sec.L.Rep. (CCH) ¶ 84,328 at 89,469. The trustee, usually a major bank, is unlike a trustee in most other contexts in that it typically performs only "ministerial duties," collecting and distributing the interest and dividends due on the portfolio securities and providing the unitholders with periodic reports concerning the interest received, amounts distributed and securities in the portfolio. *Id.* Some indentures, including those involved herein, are also executed by an "evaluator," who, together with the trustee, values the trust's assets for purposes of fixing the net asset value at which units are redeemed and based on which they will trade in the secondary market.

### D. The Relevant Terms of the Trusts Herein

The three classes agree that the provisions of the trust indentures involved here are clear and unambiguous; however, based on the very same provisions, the classes arrive at two opposite results. The Current Holders and the Continuous Holders essentially have the same interests and thus take the same position. The issue is between those two classes and the Former Holder class. The Current and Continuous Holders con-

---

**2.** The Current Holders, in opposition to the plaintiffs' motion for summary judgment in the *U.S. Trust* action, allege for the first time that factual issues exist with respect to their counterclaims. Those claims, however, do not affect the main claims of these actions which are among the competing classes. (In any event, I find that the counterclaims should be dismissed. *See* pp. 305–310, *infra.*)

tend that the terms of the indentures mandate that only those who were unitholders when the settlement proceeds were received by the Trustee plaintiffs may receive them, while the Former Holders contend that the terms of the indentures do not address the question of administration of such settlement proceeds and that it is they who are entitled to them under theories of, *inter alia*, res *judicata* and equity.

There are 335 Trust indentures in the U.S. Trust action and 11 in the *Investors* action ("Indentures"), but the sections relevant here are the same in all of them with minor exceptions, and the parties have so stipulated. The Indentures in *U.S. Trust* fall into one of two different formats, with some slight differences in language; those in *Investors* are all the same for relevant purposes here and contain only minor differences from those in *U.S. Trust.* The Indentures provide as follows:

(a) The Trustee is to administer an "Interest Account," a "Principal Account" and a "Reserve Account." *U.S. Trust* ¶ 5(b); Ex. C §§ 3.02, 3.03, 3.04 and Ex. D §§ 3.02, 3.03, 3.04; *Investors* ¶ 4(b); Ex. B §§ 3.01, 3.02, 3.03.³ All interest collected by the Trustee on the bonds is to be credited to the Interest Account. The Indenture provision concerning the Principal Account is at the heart of the dispute herein, so I will set forth the relevant language as it appears in the three different Indenture formats:

(1) Principal Account: The Bonds and all moneys ... other than amounts credited to the Interest Account, received by the Trustee in respect of the Bonds shall be credited to ... the "Principal Account." *U.S. Trust* Ex. C § 3.03.

(2) *Principal Account.* All funds, other than amounts credited to the Interest Account received by the Trustee in respect of the Bonds shall be credited to ... the "Principal Account" ....

*U.S. Trust* Ex. D § 3.03.

(3) *Certain Moneys to be Credited to Principal Account.* With respect to each Trust Fund all moneys ... other than amounts credited to the Interest Account received

by the Trustee in respect of the Bonds under this Agreement shall be credited to ... the "Principal Account" ....

*Investors* Ex. B § 3.02. The Reserve Account is to contain funds drawn from the other two accounts in such amounts as needed by the Trustee to pay taxes and other governmental charges for the Trusts. *U.S. Trust* ¶ 5(e); Ex. C § 3.04 and Ex. D § 3.04; *Investors* ¶ 4(e); Ex. B § 3.03.

(b) The Trustee is to make to each unitholder periodic payments of that investor's pro rata share of the cash balances in the Interest Account and the Principal Account. The dates of these payments vary depending upon the type of Indenture (generally a specific date each month, each quarter or each half-year), but each Indenture provides that the unitholders entitled to payments are those who were unitholders as of the close of business on that "Record Date" ("Record Day" in the *Investors'* Indentures) as set in the Indenture. *U.S. Trust* ¶ 5(g) and (h); Ex. C § 3.05 and Ex. D § 3.05; *Investors* ¶ 4(g) and (i); Ex. B §§ 2.04 and 3.04(b).

(c) Unitholders of record as of a Record Date "shall be entitled"—or, in the case of all *U.S. Trust* Indentures, even more emphatically, "shall be conclusively entitled"—to payment, "and no liability shall attach to the Trustee by reason of payment to any [such unitholder] of record." U.S. Trust ¶ 5(j); Ex. C § 3.05; Ex. D § 3.05; *Investors* ¶ 4(k); Ex. B § 3.04(e).

(d) The text of the Certificate of ownership issued to each unitholder is recited in the Indentures. The Certificate provides, *inter alia*, that it is issued subject to all the terms of the Trust Indenture, that the owner of it assents to be bound to all the Indenture terms and that it is transferable. *U.S. Trust* ¶ 6(a) and (b); Ex. C, pp. 4–5; Ex. D, pp. 10–11; Investors ¶ 5(a)–(c); Ex. B, p. 3.

### DISCUSSION

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

**3.** References are to the stipulations of the parties and the Indentures submitted as exhibits thereto.

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "It is a well established rule in this Circuit that the '[i]nterpretation of indenture provisions is a matter of basic contract law.'" *Jamie Securities Co. v. The Limited, Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989) (quoting *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir.1982)), *cert. denied*, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983). Each of the Indentures at issue in the *U.S. Trust* action provides that the "laws and rules of construction of [New York] shall govern the rights of the parties hereto and the Certificateholders and the interpretations of the provisions hereof." Those in the *Investors* action provide that Missouri law shall govern. The Second Circuit has set forth the applicable principles of New York contract law as follows:

> Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed. *See Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978). Construing an unambiguous contract provision is a function of the court, rather than a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument. *See Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979). A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, *Fiore v. Fiore*, 46 N.Y.2d 971, 973, 415 N.Y.S.2d 826, 389 N.E.2d 138 (1979), nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case. *See De Vanzo v. Newark Ins. Co.*, 44 A.D.2d 39, 43, 353 N.Y.S.2d 29 (2d Dep't 1974), aff'd, 37 N.Y.2d 733, 374 N.Y.S.2d 619, 337 N.E.2d 131 (1975).

*Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir.1992) Thus, when language contained in a contract is clear, the court is to give effect to the contract and grant summary judgment without reference to extrinsic evidence. *Kirschten v. Research Institutes of America, Inc.*, No. 94 Civ. 7947, 1997 WL 739587 at *5 (S.D.N.Y. Sept.24, 1997); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094–95 (2d Cir.1993); *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 148 (2d Cir. 1993). As the "principles of contract construction are very nearly universal throughout the United States," *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 946 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981), the provisions of Missouri contract law are the same in all significant respects. *See, e.g., TNT Speed & Sport Ctr., Inc. v. American States Ins. Co.*, 114 F.3d 731, 732 (8th Cir.1997) (quoting *Shaffner v. Farmers Mut. Fire Ins. Co.*, 859 S.W.2d 902, 906 (Mo.App.1993)); *Carondelet Health Sys., Inc. v. Royal Gardens Associates*, 943 S.W.2d 669, 673 (Mo.App.1997); *Marshall v. Pyramid Development Corp.*, 855 S.W.2d 403, 406 (Mo.App.1993).

## I. *The Rights to the Fund*

It is quite clear that under the terms of the Indentures the interpleaded Fund must be distributed to the members of the Current Holder and Continuous Holder classes, who were the owners of record of units in the Trusts on the applicable Record Dates when the Trusts came into possession of the distributions from the settlement funds in MDL 551. The property of each Trust consists simply of the bonds it purchases and all money received as a result of holding those bonds. All money received must be put into one of two accounts to be maintained by each Trustee—if interest on a bond, it goes to the Interest Account; if not, it goes to the Principal Account. (The Reserve Account is funded only by drawing money out of the other two). Each account must then be periodically paid out to the unitholders of record.

The Former Holders, of course, were not unitholders as of the relevant Record Dates herein, having sold their ownership certificates before any MDL 551 proceeds were received by the Trustees. Given the clear, unambiguous dictates of the trust Inden-

tures, the Former Holders are reduced to propounding three imaginative but meritless arguments.

One of their arguments is that because the settlement proceeds from MDL 551 represent damages from a tort claim, they are neither principal nor interest and therefore not subject to distribution under the terms of the Indentures. This argument fails for numerous reasons. As set forth above, each Indenture mandates that "all moneys" (sometimes phrased "all funds") other than interest on the bonds, which are "received by the Trustee in respect of the Bonds" must go into the Principal Account. The 335 Indentures in *U.S. Trust* further specify that unitholders *as of* an applicable Record Date "*shall* be conclusively entitled" to their share of the Account; similarly the 11 Indentures in *Investors* provide unitholders of record *as of* the applicable date "*shall* be entitled" to such distribution. The Former Holders first comb one of the paragraphs of the preamble to the *U.S. Trust* Indentures:

> WHEREAS, the Depositors desire to provide for the collection and distribution by the Trustee of the *principal of and interest on such securities held in a trust fund* for each series to such persons as shall purchase interests therein, and to provide for other terms and conditions upon which *such trust funds shall be established and administered* . . . .

*U.S. Trust* Ex. D, p. 1. (emphases added by Former Holders). They then argue that because the interpleaded moneys are proceeds of securities fraud claims, they are "neither principal, interest nor the bond themselves." *See* Memorandum of the Former Holder Class "B" in Support of Their Motion for Summary Judgment, p. 18. Having stated this *ipse dixit*, they continue that, because the settlement proceeds are thus not part of the trust fund, the Indenture does not cover their "establishment or administration" and point out the Indenture's definition of Trust Fund:

> "Trust Fund" shall mean the trust created by this Indenture . . . and which shall consist of the Bonds held pursuant and subject to this Indenture together with all undistributed interest received or accrued thereon, and any undistributed cash realized from the sale, redemption, liquidation or maturity thereof.

*U.S. Trust* Ex. C § 1.01(8). Contending that "[p]roceeds from a 'sale, redemption, liquidation, or maturity' " does not include litigation proceeds, they state that such moneys are thus "moneys in respect of the fraud" (by which they presumably mean to differentiate them with the language of the Indentures defining Principal as "moneys in respect of the Bonds"). Memorandum of. the Former Holder Class "B" in Support of Their Motion for Summary Judgment, pp. 18–19.

First, it might be mentioned that, if the Former Holders are correct that the drafters of all these Indentures and all the parties who entered into them did not provide for how damages or proceeds received by such trusts from fraud litigation (or, by their same reasoning, from what would be a multitude of other types of litigation (as well as from potential sources unrelated to litigation proceeds)), are to be administered, then there would surely be a material ambiguity in the Indentures that would require us to go outside the four corners of the document and seek extrinsic factual evidence.[4] Every party to these actions, however, including the Former Holders firmly asserts the contrary—*i.e.*, that the Indentures are clear and unambiguous. But, beyond the fact of this inconsistency in their position, is the fact that the Indentures are quite clear in their definition of Principal: all moneys received "in respect of the Bonds." It is these plain words of the contract that must be given effect. The "WHEREAS" clause as to the general statement of the Trust's purpose taken from the Indenture's Preamble is hardly inconsistent with the clear, specific provisions

---

4. When a contract is silent on a matter that requires resolution in order to construe the contract's other provisions, summary judgment is inappropriate. The court cannot simply write a term into the contract but must, instead, turn to extrinsic evidence to ascertain the intent of the parties. *See, e.g., Cruden v. Bank of New York,* 957 F.2d at 976; *Haines v. City of New York,* 41 N.Y.2d 769, 772, 396 N.Y.S.2d 155, 364 N.E.2d 820 (1977); *Kirschten v. Research Institutes of America, Inc.,* 1997 WL 739587 at *8.

in the body of the Indenture (§ 3.03) dictating the method of administration and disposition of all money, other than interest, "in respect of the Bonds." Similarly, the Former Holders' argument that the definition of Trust Fund does not include funds such as the MDL 551 settlement proceeds ignores the fact that, again, in those Indentures that contain this particular definition of Trust Fund, it is not inconsistent with the definition of Principal Account. Moreover, this definition of Trust Fund appears in only some of the *U.S. Trust* Indentures. The remaining *U.S. Trust* Indentures and all of the *Investors* Indentures contain a definition of Trust Fund that, under the Former Holders' own reasoning, would encompass the settlement proceeds:

*Trust Fund*

Shall mean the Trust created by the Indenture which shall consist of the Bonds and all undistributed interest *or other amounts received* or accrued thereon and any undistributed cash held in the Principal and Interest Accounts or otherwise realized from the sale, liquidation, redemption, prepayment or maturity of the Bonds, exclusive of any amounts which may be on deposit in the Reserve Account.

*U.S. Trust* Ex. D, p. 16 (emphasis added).

*Trust Fund*

Any one of the separate trusts created by this Agreement which shall consist of the Bonds and all undistributed interest *or other amounts received* or accrued thereon and any undistributed cash held in the Principal and Interest Accounts or otherwise realized from the sale, liquidation, redemption or maturity of the Bonds, exclusive of any amounts which may be on deposit in the Reserve Account.

*Investors* Ex. B, p. 10 (emphasis added). Yet, the Former Holders nevertheless make the same argument across the board. Indeed, in their memoranda of law in the *Investors* action they simply boldly assert, despite the above clear language, that the language of the Indenture "make[s] clear that the trust fund is composed of bonds and cash held in the principal and interest accounts or otherwise realized from the sale, liquidation, redemption or maturity of the bonds" and that "the net settlement fund proceeds do not result from the sale, liquidation, redemption, or maturity" of the bonds. *See, e.g.,* Memorandum of Law of Thomas B. Bachhuber, *et al.,* and Defendant Class of Former Unitholders (Class B) in Support of Motion for Summary Judgment, pp. 23–24.[5] In sum, the illogical, circuitous and just plain incorrect route by which they arrive at a conclusion that these interpleaded Funds do not constitute Principal under the terms of these Indentures must be rejected.

Nor do I accept the Former Holders' contention that by bringing these interpleader actions so as to determine to whom the Fund should be distributed the Trustees thereby acknowledged that the trust Indentures do not cover this situation. All that is required for the bringing of an interpleader case is that there are or might be conflicting claims to a fund, without regard to the relative merits of those claims (as more fully discussed below in connection with the Trustees' motion for summary judgment as to the Current Holders' counterclaims). *See, e.g., Washington Elec. Coop., Inc. v. Paterson, Walke & Pratt,* 985 F.2d 677, 679 (2d Cir. 1993); *John Hancock Mut. Life Ins. Co. v. Kraft,* 200 F.2d 952, 953–54 (2d Cir.1953). Moreover, regardless of what the Trustees' view of the merits of the situation may be (on which they have stayed neutrally silent), it would be in no way controlling. A contract, the meaning of which is otherwise plain, is not rendered ambiguous by the fact that parties can argue different interpretations of the contract. *See, e.g., Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d at 1095; *Natwest USA Credit*

---

**5.** They, furthermore, find it "significant" that the MDL 551 court, in distributing the settlement fund to class members therein, did not designate these proceeds as either principal or interest to be paid into these unit investment trusts. *Id.,* p. 23. The MDL 551 court, however, did not do so obviously because it had no reason to do so. No such issue was before it. It simply made distributions of the proceeds to the class members, *i.e.,* all of the many, many thousands in the classes, including these Trusts.

*Corp. v. Alco Standard Corp.*, 858 F.Supp. 401, 413 (S.D.N.Y.1994).

■ Another argument advanced by the Former Holders is that we need not even look to the provisions of the Indentures herein to determine to whom the distribution of the settlement proceeds should be made because the Former Holders are entitled to them under the principles of *res judicata.* They argue that the judgment in the MDL 551 Litigation, which approved the allocation plan for the settlement fund therein, including what amounts the Pre–Termination and Post–Termination classes as well as Chemical Bank representing all WPPSS bondholders including those who had purchased after June 15, 1983 would receive, bars those who purchased units in the Trusts after June 15, 1983, *i.e.,* the Current Holders. The argument mischaracterizes both the MDL 551 Litigation and the law of *res judicata.*

As indicated earlier (*see* pp. 295–96, *supra* ), the MOL 551 court dismissed the tort claims of WPPSS bondholders who had purchased their bonds after June 15, 1983 in the action brought by Chemical Bank as WPPSS bond trustee, which had been consolidated with all the other litigation. Judge Browning held in December 1987, citing *Nucorp Energy Securities Litigation,* 772 F.2d 1486, that tort rights do not accompany a bond that is sold, but remain with the purchaser allegedly originally injured. In 1989, when the settlement plan for MDL 551 was pending approval by the court, a group of persons who had purchased the bonds after June 15, 1983 objected to the plan insofar as they would not share in the award for the fraud claims (although they were to receive compensation for their contract and other claims based on the bonds). Judge Browning again rejected their claim. The Former Holders now argue that that judgment bars the Current Holders herein, who by definition did not purchase their units in the Trusts until after June 15, 1983, from recovery.

"[T]he doctrine of *res judicata,* or claim preclusion, provides that '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in

that action.' " *Maharaj v. BankAmerica Corp.,* 128 F.3d 94, 97 (2d Cir.1997) (quoting *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)). In determining whether a second suit is barred by this doctrine, even where—unlike here—the first and second suits involve the same parties, similar legal issues, similar facts, or essentially the same type of wrongful conduct, *res judicata* does not necessarily attach:

> With respect to the determination of whether a second suit is barred by res judicata, the fact that both suits involved essentially the same course of wrongful conduct is not decisive; nor is it dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues. A first judgment will generally have preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first.

*Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir.1997) (quoting *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1463–64 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997)). *See also id.* at 90, citing, *inter alia,* Restatement (Second) of Judgments § 24 cmt. a ("Claim, in the context of res judicata, has never been broader than the transaction to which it related"); *Maharaj v. BankAmerica Corp.,* 128 F.3d at 97; *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d at 1464.

The Former Holders' claim of *res judicata* is misplaced and does not need extended discussion. Quite simply, the MDL 551 Litigation involved neither the same parties nor the same issues involved herein. The plaintiffs in MDL 551 were all persons or entities (such as the Trusts herein) who owned WPPSS bonds, and the defendants were WPPSS itself as well as persons and entities related to it (lawyers, accountants, engineers, investment bankers, etc.). The parties here, apart from the nominal plaintiff Trusts, are all persons or entities who owned units in these unit investment trusts, the holdings of

which included WPPSS bonds. The issue in MDL 551 on the tort claim was, of course, whether WPPSS and its related entities had committed fraud which caused the plaintiffs there to purchase the bonds. The issue here, of course, is which of the holders of units in these Trusts is entitled under the terms of the Trusts to receive property of the Trusts. The Current Holders did not assert and could not have asserted the claim they bring here in the MDL 551 Litigation for they were not parties therein nor were they represented by the Trustees therein. That purchasers of WPPSS bonds after June 15, 1983 were barred from that portion of the settlement fund allocating recovery to the alleged fraud by WPPSS has no bearing on the rights of unitholders herein vis-à-vis one another, which rights are governed by contract law. The MDL 551 court never considered any of the 346 Indentures at issue here nor the rights of the unitholder parties to those Indentures and obviously never decided who, as parties to the Indentures, would be entitled to distribution of the amount given to the Trustees herein. The claim of *res judicata* must therefore be rejected.

■ The final contention of the Former Holders is that equity compels that they receive the Fund rather than Current Holders because they, as purchasers of units prior to June 15, 1983, are the ones who were injured, not the Current Holders who purchased thereafter, and the proceeds of the MDL 551 Litigation were intended to compensate only the earlier purchasers. This argument of unjust enrichment—which was anticipated by the Trustees, causing them to bring these interpleader actions—while having some initial visceral appeal, fails upon an

understanding of the terms of the Trust Indentures, of the nature of unit investment trusts, of the provisions of the 1940 Act, and of the parameters of the MDL 551 Litigation.[6] Indeed, I believe that were we to accept this contention we would unjustly enrich the Former Holders as should be apparent from the discussion below. However, it bears remembering that even were such not the case and there were some inequity in denying an award to the Former Holders, it would not matter to the outcome herein, for, as the Second Circuit stated succinctly in *Cruden v. Bank of New York,* "A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." 957 F.2d at 976 (citations omitted).

It is well-established under federal securities law that securities fraud claims are not automatically transferred to a subsequent purchaser upon the sale of the underlying security, but rather stay with the party injured. *See, e.g., Bluebird Partners v. First Fidelity Bank, N.A.,* 85 F.3d 970, 974 (2d Cir.1996); *In re Nucorp Energy Securities Litigation,* 772 F.2d at 1490; *Lowry v. Baltimore & Ohio R.R.,* 707 F.2d 721, 729 (3d Cir.) (en banc) (Garth, J., concurring), *cert. denied,* 464 U.S. 893, 104 S.Ct. 238, 78 L.Ed.2d 229 (1983); *In re Saxon Securities Litig.,* 644 F.Supp. 465, 473–74 & n. 16 (S.D.N.Y.1985). This, indeed, is what Judge Browning held in MDL 551 when he refused to accede to the claim of those who had purchased their WPPSS bonds after June 15, 1983 that they share in the distribution of the settlement allocated to the fraud claims.

6. The Former Holders point out that, in considering class certification at the initial phases of these cases, I seemed to endorse their position, explaining in my Report and Recommendation to you as to class certification that "[i]t is arguable that equity may require the payment only to unitholders or former unitholders who were damaged by the alleged fraud, despite the language of the indentures. The trustee plaintiffs, unable to determine safely to whom the Fund should be distributed and subject to litigation for breach of trust no matter what they decided, ask this court to determine the issue." *United States Trust Co. v. Alpert,* 163 F.R.D. at 414. I also stated, in discussing adequacy of class representation as it would pertain to those who would pursue such an argument, that insofar as a class member who purchased after June 15, 1983 was not "damaged" by the fraud alleged in the MDL 551 Litigation, "she would be very differently situated from [an earlier purchaser] ...." *Id.* at 415. These statements were hardly intended as any sort of determination of the merits of the position at that time. Indeed, none of the Indentures had yet been submitted to the court for review, and I had not of course researched the nature of the law as it might pertain to these types of unit investment trusts and these Indentures' provisions in particular.

The Former Holders have taken this principle of law and twisted it on its head in order to claim that they, therefore, retained the rights in the settlement award. As they did in conjunction with their *res judicata* contention, they deliberately blur the distinction between bondholders—owners of WPPSS bonds prior to June 15, 1983 and unitholders—owners of units in the instant Trusts—at that time. It is disingenuous of the Former Holders to refer continually to themselves as "bondholders" prior to June 15, 1983 and to Current Holders as bond purchasers after that date. *See, e.g.,* Reply Memorandum of Law of Thomas B. Bachhuber, *et al.,* Class B Defendants, in Support of Motion for Summary Judgment, p. 11; (Memorandum of the Former Holder Class "B" in Opposition to the Motion for Summary Judgment brought by the Current Holder Class "A," pp. 2–3). Neither of these classes ever held WPPSS bonds—the Trusts did. The Former and Current Holders held/hold units in the Trusts.[7]

By the very nature and structure of a unit investment trust under the 1940 Act (*see* pp. 292, *supra*), an owner of units does not retain any interest in or rights to trust property when she sells her units. Units are, by definition, "redeemable securities," meaning that they can be cashed in for either a "proportionate share of the [Trust's] current net assets or the cash equivalent thereof." *See* 15 U.S.C. § 80a–2(32). Thus, a unitholder who liquidates her units expects that the price she receives will fairly approximate the value of her pro rata share of all Trust assets. On a daily basis, the evaluator, who was Standard & Poor's under the *U.S. Trust* Indentures and Kemper Financial Services, Inc. under the *Investors* Indentures, places a value on the underlying bonds in the Trust, and the Trustee calculates net asset value, or per unit value, based on that and on various required adjustments set forth in the Indenture. The redemption procedure set forth in both the Trust Indentures and the Certificates of Ownership clearly and dramatically makes the point that a redeeming unitholder is selling all interests in the Trust. As dis-

cussed earlier, the Trust Indentures provide for distributions solely to the Certificateholders of record. The terms of the Trust Indentures, which are reiterated in language appearing on the Certificate of Ownership, require redeeming unitholders to physically endorse and surrender their Certificates to the Trustee. *U.S. Trust* Ex. C, pp. 4–5; *Investors* Ex. B, p. 3. In exchange, the redeeming unitholders receive a price based on the "value of the pro rata share" of the Trust on that date represented by the redeemed Certificate. *U.S. Trust* Ex. C §§ 5.01 and 5.02; Ex. D §§ 5.01 and 5.02; *Investors* Ex. B §§ 5.01 and 5.02. (An alternative redemption procedure is that a unitholder can elect to transfer her Certificate directly to a buyer rather than to the Trustee. The transferee becomes the Certificateholder of record, as the instruments specify, and owns precisely the same interests in the Trust property that the Former Holder held. *U.S. Trust* Ex. C § 5.03; Ex. D § 5.03; *Investors* Ex. B § 6.02.) The Certificate, moreover, clearly states that it is an undivided interest in the trust that is being received. *U.S. Trust* Ex. C, p. 1; Ex. D, p. 6; *Investors* Ex. B, p. 3. The Former Holders would like to ignore the fact that *they* are contractually bound to the express terms upon which they gave up their units.

Under these provisions, redeeming unitholders are literally cashing in the Certificates that embody their interests in the Trust; surrender of the Certificate represents an entire liquidation of every right in that unit. No reasonable unitholder could expect to retain any interests in Trust property whatsoever or have any right to any distribution from the Trust, and there is no language in the Trust Indentures or the Certificates, by which the unitholder is of course bound, that would lead her to expect otherwise. On the other hand, transferees of the Certificates would reasonably expect to have received all the rights the Former Holders had, including the right to receive any moneys received by the Trusts as additional Trust assets. Not to pay the settlement

---

7. It might, moreover, be remembered that none of the trusts had invested in WPPSS bonds more than 10% of its holdings, and in most of the Trusts, WPPSS bonds were less than 8% of their portfolio.

proceeds to these new owners—the Current Holders—would certainly be inequitable. In rewriting the very provisions off the clear terms of the Indentures, it would also be contrary to law.

The case of *United States Trust Co. of New York v. Executive Life Ins. Co.,* 602 F.Supp. 930 (S.D.N.Y.1984) *aff'd,* 791 F.2d 10 (2d Cir.1986), is also instructive. That case did not involve unit investment trusts, but rather corporate notes and debentures. The issue involved interest thereon which had been paid to the trustees who would have normally distributed it to the security holders on the record date under those instruments. However, the corporate borrower had been liquidated, resulting in an "event of default" under the indentures which, by their terms, prevented the trustees from any distribution in such event. When the default was cured, the trustees declared a "special record date" as provided for in the indentures. The trustees, as here, brought an interpleader class action, the issue in which was whether the "Selling Classes," comprised of persons who held the bonds when the interest payments were received by the trustees but who sold prior to the special record date, or the "Holding Classes," consisting of those who had obtained bonds transferred by those in the Selling Classes and held them on the special record date, should receive the interest payments. This court granted summary judgment to the Holding Class since the indentures provided for payment to holders on a special record date after cure of a default. The court observed that "[t]he record date mechanism allows the trustee to perform the ministerial function of paying interest to the bondholders in an orderly and uniform manner." *Id.* at 937. The court noted that those who sold their right to the interest payments did so at the risk that, because of the language in the indentures, they would not receive any possible distribution of them, adding "[t]hey were not compelled to sell; indeed some of the original holders of the Debentures did not sell." *Id.* at 939.

Finally, for the court to do herein what the Former Holders urge would turn around the workings of the financial markets for these types of securities and for mutual funds in general. The market expects that unit investment trusts will be valued and will operate according to the terms of their trust indentures and the 1940 Act. There is no dispute herein that the provisions of the Trusts' Indentures relating to record dates and distributions are basically standard, "boilerplate" provisions for these instruments. Uniformity of interpretation of such provisions is essential to the efficiency of the markets. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d at 1048; *Broad v. Rockwell Int'l Corp.,* 642 F.2d at 943. I think it fair to assume that, if this court were to award these settlement proceeds to the Former Holders out of their theory of "equity" rather than apply the directives of the language of the Indentures, it would send shock waves to the markets. In *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F.Supp. 1504 (S.D.N.Y.1989), the plaintiff, holder of defendant RJR Nabisco bonds, sought to block RJR Nabisco's leveraged buyout of its own stockholders by implying a covenant of good faith and fair dealing into plaintiff's bond indentures. This court held the indentures did not expressly or implicitly include such a provision and that to accept the plaintiff's position "would interfere with and destabilize the market."

And this court, like the parties to these contracts, cannot ignore or disavow the marketplace in which the contract is performed. Nor can it ignore the expectations of that market—expectations, for instance, that the terms of an indenture will be upheld, and that a court will not, *sua sponte,* add new substantive terms to that indenture as it sees fit. The Court has no reason to believe that the market, in evaluating bonds such as those at issue here, did not discount for the possibility that any company, even one the size of RJR Nabisco, might engage in an LBO heavily financed by debt. That the bonds did not lose any of their value until the October 20, 1988 announcement of a possible RJR Nabisco LBO only suggests that the market had theretofore evaluated the risks of such a transaction as slight.

716 F.Supp. at 1520. To accept the Former Holders' contention would mean that when-

ever any trustee of a unit investment trust, mutual fund or similar investment vehicle received a payment from a litigation concerning a company whose security it held at any time in the past, it would have to seek a determination from a court as to whom the moneys should be paid, which would in each instance depend upon, *inter alia*, the circumstances of the underlying litigation. The principle would logically extend to possible payments from other sources as well (*e.g.*, an I.R.S. tax refund for an overpayment in some prior year). Clearly, such a concept would not only change the very nature of the investment but also be an unworkable concept.

## II. *The Motion of the U.S. Trust Plaintiffs*

■ In their answer to the complaint in the *U.S. Trust* action, the Current Holders advanced three counterclaims. The first two, the only ones still at issue, allege that because the terms of the Indentures are clear, plaintiff Trustees breached both the Indentures and their fiduciary duties by failing to distribute the settlement proceeds to the Current Holders when received and, instead, commencing this interpleader action.[8] Plaintiff Trustees, seeking summary judgment, argue that because they were following the statutorily authorized procedure, the counterclaims are not claims on which relief can be granted. I agree, and the motion should be granted for numerous reasons.[9]

The Interpleader statute provides for maintenance of an interpleader action by a holder of money or property in excess of $500 that a plaintiff deposits into the registry of the court if "[t]wo or more adverse claimants, of diverse citizenship ... are claiming *or may claim to be entitled* to such money or property, or to one or more of the benefits arising by virtue of any note, bond, certificate, policy or other instrument, or arising by virtue of any such obligation." 28 U.S.C.

§ 1335(a) (emphasis added). Plaintiffs' explanation of their reason for bringing this action is the same now as they have expressed since its inception: that they faced a dilemma upon receipt of the MDL 551 proceeds because the Trusts' Indentures clearly provided for distribution to those who held units at the time of receipt, but it could be argued by those who had earlier held but sold units that equity mandated a different result; therefore, the Trustees faced the possibility of litigation against them by either one of the groups if they paid the proceeds out to the other.

The Current Holders argue that there is no evidence that there had been any claim to the money or threat thereof made by any Former Holder and that the interpleader action is "an apparent effort [by the Trustees] to insulate themselves from speculative, if not fantastic liabilities." Memorandum of Law in Opposition to Plaintiffs' Motion, p. 6. But, the existence of actual conflicting claims is not a requirement for an interpleader action. Rather, as the Second Circuit has held, an interpleader action is proper if the stakeholder has "a real and reasonable fear of double liability or vexatious, conflicting claims." *Washington Elec. Coop., Inc. v. Paterson, Walke & Pratt*, 985 F.2d at 679. Thus, "interpleader is proper if the party requesting it 'is or may be exposed to double or multiple liability.'" *Id.*, quoting Fed. R.Civ.P. 22(1). It has long been the law that "a stakeholder, acting in good faith, may maintain a suit in interpleader for the purpose of ridding himself of the vexation and expense of resisting adverse claims, *even though he believes that only one of them is meritorious.*" *Hunter v. Federal Life Ins. Co.*, 111 F.2d at 551 (emphasis added); *See also Francis I. du Pont & Co. v. Sheen*, 324 F.2d 3, 6 n. 1 (3d Cir.1963) ("courts do not require an obligor to forego interpleader so

---

**8.** The Current Holders agree at this time that the third counterclaim, which sought a declaratory judgment that the Current Holders are entitled to the Fund, is in actuality simply a claim against the Fund and should be redesignated as such. In any event, my conclusion herein that they are entitled to distribution renders the claim moot.

**9.** Plaintiffs argue initially that a court lacks jurisdiction over any counterclaims pleaded against

an interpleader plaintiff. However, "[t]he rule in the majority of jurisdictions [including this court] is that a claimant may assert a counterclaim against a stakeholder in an interpleader action, provided the counterclaim arises out of the same transaction or occurrence as those underlying the interpleader." *Prudential Ins. Co. of America v. Rowson*, No. 93 Civ. 7738(KMW), 1994 WL 455536 at *3 (S.D.N.Y. Aug.19, 1994).

long as there is even slight risk that otherwise he may be harassed by conflicting claims" (citations omitted)); *A/S Krediit Pank v. Chase Manhattan Bank*, 155 F.Supp. 30, 34 (S.D.N.Y.1957) (refusing to dismiss an interpleader action where one claimant asserted that the other claims to the fund were invalid on their face and unsupported by the governing instruments and no adverse party had in fact asserted a claim to it prior to the commencement of the action, because the "mere threat of future litigation is a sufficient basis for interpleader under the rule"); *John Hancock Mut. Life Ins. Co. v. Kraft*, 200 F.2d at 953–54.[10]

Since the Trustees in bringing their interpleader action thus acted within the rights granted to them by law, "counterclaims cannot be grounded upon adherence to such a statutorily authorized procedure." *Companion Life Insurance Co. v. Schaffer*, 442 F.Supp. 826, 831 (S.D.N.Y.1977). While the Current Holders throw reference to various authorities in an attempt to paint a picture portraying otherwise, none of their authority supports the viability of a counterclaim which turns simply on whether the interpleader plaintiff acted properly in bringing the interpleader action. Thus, in *Wayzata Bank & Trust Co. v. A & B Farms*, 855 F.2d 590 (8th Cir.1988), the counterclaim asserted against the interpleader plaintiff was that it had improperly disbursed part of the fund in contravention of the governing instrument before beginning the action—the accusation the Trustees here did not wish to risk and therefore brought this action—not, as here, that the very commencement of the interpleader action and deposit of funds into the court was a breach. Likewise, in *Wasserman v. Fidelity & Deposit Co.*, 490 F.Supp. 564 (S.D.N.Y.1979), the counterclaims concerned the correctness of payments made by the interpleader plaintiff from the fund before the commencement of the action. In *Priority Records, Inc. v. Bridgeport Music,*

*Inc.*, 907 F.Supp. 725 (S.D.N.Y.1995), the interpleader was brought by plaintiff to determine the proper recipient of royalty payments on copyrighted musical compositions, and the counterclaims asserted were that certain uses by plaintiff had been unlicensed.

In sum, the cases involved counterclaims against the interpleading plaintiffs for specific, allegedly wrongful conduct related to the events in issue. The Current Holders have not cited to any authority supporting the proposition that the proper commencement of an interpleader action may in itself give rise to a counterclaim against the stakeholder for failing, instead, to have paid the moneys out to the counterclaiming defendant without benefit of court adjudication of conflicting claims among defendants.

■ The Current Holders, in opposition to the Trustees' summary judgment motion, for the first time inform this court that the discovery they received from the Trustees was inadequate and they claim to need further discovery to show genuine issues of material fact to oppose the motion. They say that although they were promised further responses to interrogatories and further documents by the Trustees, they never received them. The remainder of my discussion below is *dicta.* Because I hold that no cause of action arises simply from the commencement of an interpleader action, as the Current Holders' counterclaims allege, no discovery—even if improperly withheld by plaintiff—could assist the Current Holders to raise any genuine issue of material fact and avoid dismissal as a matter of law. I discuss the issue briefly, however, for the benefit of the parties and because, like the discussion thereafter, it may have some impact upon the fees that will eventually be requested by counsel for the classes herein. Obviously, the issue of fees will be fully considered at the appropriate time.[11]

---

**10.** The Trustees are careful to explain that nothing contained in their motion papers is meant to imply any opinion on the merits of the claims among the classes because they "must be, and are, scrupulously neutral." Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, pp. 6–7 n. 3.

**11.** Likewise, not before the court today but something of which counsel should be put on notice, is the question of whether or in what amount plaintiffs may be entitled to fees from the Fund. As this court explained in *Companion Life v. Schaffer:* "Attorneys's fees and costs are awarded to an innocent and otherwise disinterested stakeholder who has been required to expend

It might initially be noted that neither during discovery nor after its completion did the Current Holders ever bring to the court's attention their contention that the Trustees' discovery responses were inadequate. No motion to compel responses nor any mention whatsoever of purported discovery problems was ever made to the court. (Indeed, it is only now upon this motion, contrary to all prior representations, that any party expresses a belief that there is any issue of fact with respect to these actions.) Moreover, while they state they need further discovery to show issues of fact, they *still* do not request that the court order any! When a party faced with a summary judgment motion finds it cannot present facts essential for opposition without further discovery, it may receive a continuance pursuant to a motion under Fed.R.Civ.P. 56(f). In support of such a motion, a party must provide an affidavit describing (1) the nature of the uncompleted discovery; (2) how the facts sought are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why those efforts were unsuccessful. *See, e.g., Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994). Were we to consider the Current Holders' opposition papers on this summary judgment motion to be requesting further discovery, they have hardly shown why any is required, nor why at this date, after having slept on their rights, they should be afforded any. To be sure, their argument is half-hearted. On the one hand, they purport to show why certain discovery is needed. On the other hand, they purport to show based an the discovery they received that there are issues of fact precluding summary judgment.

I have reviewed each and every discovery request to which the Current Holders say they require further response. Suffice it to say that, assuming for the moment that the counterclaims were valid causes of action, I find none of the discovery requests designed to lead to facts that would be relevant to prove their allegations.[12] Moreover, nothing presented by the Current Holders persuades me that the Trustees' responses to their discovery requests were insufficient. For example, production of the Trusts' Annual Reports had been requested. The 335 trusts in this action issued 5,067 Annual Reports since

time and money to participate in a dispute not of his own making and the outcome of which has no impact upon him. However, in cases in which the claims are of the type that arise in the ordinary course of business, fees should not be granted perfunctorily. Such is the cost of doing business which should not be transferred by invoking interpleader." 442 F.Supp. at 830 (citations omitted). *See also United States Trust Co. of New York v. Executive Life Ins. Co.*, 791 F.2d 10 (2d Cir.1986), *aff'g* 602 F.Supp. 930 (S.D.N.Y. 1984) (denying fees to trustees because interpleader relieved them of risk of improper disbursement of funds and multiple suits); *Travelers Indemnity Co. v. Israel*, 354 F.2d 488 (2d Cir. 1965); *Metropolitan Life Ins. Co. v. Jackson*, 896 F.Supp. 318, 324–25 (S.D.N.Y.1995).

12. The heart of the Current Holders' contention with respect to further discovery seems to be centered on two things. First, they assert it is needed for them to learn about the Trustees' "justification" in commencing the interpleader action. But what could be learned remains a mystery. The Trustees have very clearly stated that they did so to avoid a possibility they envisioned of litigation against them or double liability. Precisely what the Current Holders could find that would affect their counterclaims, which assert that the Trustees violated their duties in not distributing the funds to them under these circumstances, remains a mystery. The implication is that perhaps they could happen upon some other, undefined, more sinister purpose in poring through every document in the Trustees' possession.

A corollary to this is their assertion that there are genuine issues of fact as to the scope of the Trustees' duties under the Indentures. However, they do not explain why that question is not answered by the Indentures themselves, and they do not explain where through discovery they might expect to find some other "evidence" as to the Trustees' duties. As the Second Circuit explained in *Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir.1985), "An indenture trustee is not subject to the ordinary trustee's duty of undivided loyalty. Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." *See also AMBAC Indemnity Corp. v. Bankers Trust Co.*, 151 Misc.2d 334, 338, 573 N.Y.S.2d 204, 207 (Sup.Ct.1991) (explaining the "peculiar and limited role of the indenture trustee, which has long been recognized and which is a reality of modern commercial finance" to be that the trustee's duties can be limited to those set forth in the indenture).

their inception. The Trustees located and produced 4,077 of them. The remaining ones were not located. The Current Holders complain about the missing reports, yet they point to nothing in the 4,077 they received of relevance nor to anything additional that could conceivably be learned from the missing ones.

Thus, the Current Holders' counterclaims fail as a matter of law for the reasons discussed previously. However, even were we to accept their contention that they have stated a claim—which, I stress, I do not—they have neither raised any genuine issue of material fact nor shown how further discovery could do so at all.

While no more needs to be said with respect to this motion on the counterclaims, I would like to raise several additional matters because, while the Current Holders are, in essence, accusing the Trustees of having acted in bad faith, their opposition to this summary judgment motion is itself perilously thin, and the seriousness of their assertion of these counterclaims seems dubious, given what has been their inconsistent conduct herein and less than vigorous pursuit of those claims. I simply note the following:

They claim discovery for purposes of the counterclaims has been inadequate, yet they never before, nor even now, ask the court for further discovery. Although their counterclaims were asserted May 1, 1994 in response to the Second Amended Complaint, they never opposed the establishment of the class of Former Holders and class certification. Indeed, their motion papers in connection with the class certification motions were in full support of the creation of the Former Holder class. And, the first request in their prayer for relief on their counterclaims asks the court to give "the relief requested in paragraphs b and d of the Prayer for Relief of the [Second Amended] Complaint." Paragraph b of that complaint asked the court to order "the Current Holder Class Representatives, *the Former Holder Class Representatives,* and the Continuous Holder Class

Representatives *to appear and plead in this action* and to assert their respective claims to the Fund." Paragraph d asked the court to certify "the class of Current Holders, *the class of Former Holders* and the class of Continuous Holders pursuant to the provisions of Fed.R.Civ.P. 23(b)(1)." (Emphases added). In other words, although they assert that "[t]his interpleader action is completely the construct of the Trustees who, in an apparent effort to insulate themselves from speculative, if not fantastic liabilities, have created the classes constituting the claimants in this interpleader action," the Current Holders endorsed the bringing of this action in the form brought by the Trustees rather than opposing it. The remainder of the Current Holders' prayer for relief on their counterclaims asks simply that the interpleaded Fund be awarded to them.[13]

Thereafter, when I issued my Report and Recommendation to you, on the basis of which you certified the three classes, the Current Holders voiced no objection whatsoever either to my determination that interpleader had been properly brought or to my conclusion that these classes should be certified. As I noted in that very Report in relating to you events at my first plenary conference with all the parties in March 1993:

> The lawyers for the defendants had no interest in challenging the methods either by which the plaintiffs chose to bring these actions nor by which they defined the classes, nor the adequacy of the class representatives chosen. Thus, at the very first conference with the parties, *everyone* present wished to move forward by having the classes certified, class counsel appointed and the plaintiffs dismissed from the suits—all essentially that day—without any discovery or briefing. No one to that time but this court questioned the methods and procedure by which plaintiffs chose to proceed. . . .

**13.** Although their memorandum of law in opposition to the Trustees' instant motion asserts "the question of damages suffered by the Current Holders, which damages arise from their counterclaims must be determined by the trier of

fact," and implies loss of the use of the money and management fees and taxes incurred, Memorandum of Law in Opposition, p. 7 n. 1, the counterclaims do not plead nor seek any such damages.

163 F.R.D. at 415. I explained therein the Trustees' reason for bringing the interpleader action and stated:

There is no dispute among the parties as to the proposed class definitions, nor has any opposition been filed to the maintenance of the cases as class actions or the interpleader posture of the cases.

*Id.* at 416. I added:

I see no problem with respect to the interpleader mode of proceeding and do not plan to discuss that aspect of the cases herein.

*Id.,* 163 F.R.D. at 416 n. 8. Clearly, if the Current Holders in the *U.S. Trust* action do believe the interpleader was a meritless construct of the Trustees, they had plenty of opportunity to so state.[14]

### CONCLUSION

For the reasons set forth above, I recommend, in each of these two actions, denying the summary judgment motion of the Former Holders and granting the summary judgment motions of the Current Holders and the Continuous Holders and awarding them the interpleaded Fund to be distributed according to their pro rata shares as determined under the Indentures. I further recommend granting the summary judgment motion of the *U.S. Trust* plaintiffs on the Current Holders' counterclaims.

Copies of this Report and Recommendation were mailed this date to the parties of record as shown on the attached pages.

The parties are hereby directed that if you have any objections to this Report and Recommendation you must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court and send copies to the Honorable Kimba M. Wood, to the opposing party and to the undersigned. Failure to file objections within ten (10) days will preclude later appellate review of any order that will be entered by Judge Wood. *See* 28 U.S.C. § 636(b)(1); Rules 6(a), 6(e), and 72(b) of the Federal Rules of Civil Procedure; *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL—CIO*

*Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam); *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983) (per curiam).

---

14. While there are no discernible differences in the terms of the Indentures or factual events in the *Investors* action, no such counterclaims were brought by the Current Holders therein.